OPINION ON APPELLANTS PETITION FOR DISCRETIONARY REVIEW

BAIRD, Judge.
Appellant was convicted of arson pursuant to Tex.Penal Code Ann. § 28.02. Punishment was assessed at five years confinement, probated. Tex.Code Crim.Proc.4nn. art. 42-12. The Court of Appeals affirmed. Castellano v. State, No. 04-86-00061-CR (Tex.App.—San Antonio, October 30, 1987) (not published). Appellant subsequently filed two applications for writ of habeas corpus in the convicting court but in each instance the habeas judge denied the writ. On January 9th, 1992, the new presiding judge of the convicting court issued a writ of habeas corpus on appellant’s third application and held a hearing. However, the habeas judge denied relief and the Court of Appeals affirmed. Castellano v. State, No. 04-92-00149-CR (Tex.App.—San Antonio, August 26, 1992) (unpublished). We granted appellant’s petition for discretionary review to determine whether the Court of Appeals erred in finding that the prosecution did not have imputed knowledge of a witness’ perjured testimony.[1] We will reverse.
I.
Other than appellant, the only witness during the writ hearing was Clemencia Jiminez. After the hearing, the habeas judge made the following written findings of fact and conclusions of law:
FINDINGS OF FACT
1. Judicial notice of the testimony at the original trial and the papers filed in this cause was taken.
2. Maria Sanchez was fired as an employee of the Applicant’s business after an accusation of theft was made against Maria Sanchez. Maria Sanchez told Clemencia Jiminez that she was angry at the Applicant and that she wanted to get revenge. Her plan was to tape record conversations with Applicant and then alter them to make it appear that the Applicant had burned one of his business locations. Maria Sanchez asked Clemencia Jiminez to corroborate her story and falsely accuse Applicant. Clemencia Jiminez was taken to the District Attorney’s office and was *479 interviewed by assistant district attorney Ed Sargologos where she told him that she did not know anything about the fire. After the Applicant’s conviction, Maria Sanchez told Clemencia Jiminez the (sic) her help was not needed after all and that Maria Sanchez had gotten the Applicant without her help.
3. Chris Fragozo, a police officer with the City of San Antonio, attempted to enlist Clemencia Jiminez as a witness against Applicant and aided Maria Sanchez in altering the tape recordings offered into evidence. The tapes were altered to appear that the Applicant was admitting to the arson when in fact he had no knowledge of its commission.
4. Clemencia Jiminez was a credible witness and her testimony was neither contradicted nor rebutted.
5. The perjured testimony set out by page and line in the “Defendant’s Proposed Findings of Fact and Conclusions of Law” are adopted herein as the Court’s findings.
6. Maria Sanchez and Chris Fragozo collaborated together and without their testimony and the altered tapes, there is insufficient evidence to sustain a finding of guilt in this case.
CONCLUSIONS OF LAW
1. The Court’s jurisdiction was properly invoked pursuant to Article 1, Section 12 of the Texas Constitution and Chapter Eleven of the Code of Criminal Procedure.
2. The Applicant is restrained of his liberty.
3. The Applicant has been denied Due Process and Due Course of Law, but in the absence of Case law as precedent the Applicant’s Writ is Hereby denied.[2]
Additionally, at the conclusion of the hearing, the habeas judge verbally explained his denial of relief:
I find, also, from the preponderance of the evidence, that the district attorney’s office did not participate or have direct knowledge of [the perjured testimony] at the time the trial was had.
Which brings us to the point, as far as the law is concerned, I find no authority in the State of Texas to grant a Writ of Habeas Corpus merely on the fact that perjured testimony was used. The cases cited in the application research that I have done indicates that if the state had knowingly used the testimony a different result would obtain.
II.
In affirming the denial of relief, the Court of Appeals relied upon Huffman v. State, 479 S.W.2d 62 (Tex.Cr.App.1972), and Cook v. State, 423 S.W.2d 313 (Tex.Cr.App.1968). The Court of Appeals assumed the habeas judge’s finding of perjury was supported by the record but held that Huffman and Cook required “a showing that the State knowingly used false testimony.” Castellano, slip op. pg. 3 (emphasis in original).
In holding that Ex parte Adams, 768 S.W.2d 281 (Tex.Cr.App.1989), did not apply to the instant case, the Court of Appeals stated:
Mr. Castellano relies heavily on Ex parte Adams, 768 S.W.2d 281 (Tex.Crim.App.1989); however, it is clear from the Court of Criminal Appeals opinion in Adams that a Dallas police officer knew about the witness’s perjured testimony and such knowledge on the part of the police officer was imputed to the state. Id. at 287. Here, there is no finding of knowledge by the district attorney, either imputed or direct.
Castellano, slip op. pg. 4.
We granted review to determine whether the Court of Appeals had decided an important issue of state or federal law in conflict with our decision in Adams. Tex.R.App.P. 200(c)(3). See n. 1, supra
III.
A prosecutor’s knowing use of perjured testimony violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Mooney v. Ho *480 lohan, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935), and, Pyle v. Kansas, 317 U.S. 213, 216, 63 S.Ct. 177, 178, 87 L.Ed. 214 (1942). See also, Thomas v. State, 841 S.W.2d 399, 402 (1992). In Mooney, the petitioner sought a writ of habeas corpus on the ground that he had been convicted through the use of perjured testimony and that evidence favorable to his defense had been suppressed by the prosecution. Id., 294 U.S. at 110; 55 S.Ct. at 341. In his application, Mooney set forth evidence which, he contended, proved the testimony against him had been perjured and that the prosecution knowingly used the perjured testimony. Id. The Supreme Court emphasized the detrimental effect of perjured testimony upon due process:
[Due Process], in safeguarding the liberty of the citizen against deprivation through the action of the state, embodies the fundamental conceptions of justice which lie at the base of our civil and political institutions ... It is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a state to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.
Id., at 112, 55 S.Ct. at 342.
In Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957), the Supreme Court considered a prosecutor’s passive use of per-jurious testimony. Alcorta was charged with murdering his wife. Alcorta admitted the murder but claimed it was done in a fit of anger after discovering his wife late at night in a parked ear, kissing a man named Castil-leja. Castilleja witnessed the murder and testified for the State. When questioned by the prosecutor about his relationship with the decedent, Castilleja denied any romantic involvement. Id., 355 U.S. at 28-29; 78 S.Ct. at 104. After Alcorta’s conviction, Castilleja admitted that he gave false testimony at trial and that, prior to trial, he had informed the prosecutor about his affair with Alcorta’s wife. Id., 355 U.S. at 30-31; 78 S.Ct. at 105. The Supreme Court extended the Mooney Rule to include the passive use of perjured testimony and held that the prosecutor’s knowing failure to correct Castilleja’s perjured testimony denied Alcorta due process. Id., 355 U.S. at 31, 78 S.Ct. at 105. See also, Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) and, Ex parte Adams, 768 S.W.2d 281, 288, 291 (Tex.Cr.App.1989).
In certain circumstances, knowledge of perjured testimony may be imputed to a prosecutor who lacks actual knowledge of the falsity.[3] Giglio v. U.S., 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); Adams, 768 S.W.2d at 291. In Giglio, an Assistant U.S. Attorney promised Giglio’s co-conspirator that, in return for his cooperation, he would not be prosecuted. Id., 405 U.S. at 151-152, 92 S.Ct. at 765. However, a different Assistant U.S. Attorney, unaware of the agreement with the co-conspirator, prosecuted Giglio. At trial, the co-conspirator perjured himself by denying he had any agreement with the Government. Id. The Supreme Court held the knowledge of the agreement with the co-conspirator was imputable to the Assistant U.S. Attorney who tried the case:
... [Wjhether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor’s office is an entity and as such it is the spokesman for the Government. A *481 promise made by one attorney must be attributed, for these purposes, to the Government.
Giglio, 405 U.S. at 154, 92 S.Ct. at 766. The Court found Giglio was denied due process by the Government’s failure to correct the co-conspirator’s perjured testimony. Id.
The Giglio Rule of imputed knowledge has been extended to include police officers as well as prosecutors. In Adams, 768 S.W.2d 281, we noted that for the purposes of imputing knowledge to the prosecution, courts have “declined to draw a distinction between different agencies under the same government, focusing instead upon the ‘prosecution team’ which includes both investigative and prosecutorial personnel.” Id., 768 S.W.2d at 292 (citing United States v. Antone, 603 F.2d 566, 569 (5th Cir.1979)). See also, Ex parte Brandley, 781 S.W.2d 886, 892 n. 7 (Tex.Cr.App.1989). We further stated, “[I]t is of no consequence that the facts pointed to may support only knowledge of the police because such knowledge will be imputed to state prosecutors.” Adams, 768 S.W.2d at 292 (citing Williams v. Griswald, 743 F.2d 1533, 1542 (11th Cir.1984)). See also, Duggan v. State, 778 S.W.2d 465, 468 (Tex.Cr.App.1989) (“It does not matter whether the prosecutor actually knows that the evidence is false; it is enough that he or she should have recognized the misleading nature of the evidence.”); Harris v. State, 818 S.W.2d 231, 233 (Tex.App.—San Antonio 1991) (“[Knowledge of the police will be imputed to the prosecutor.”); Zule v. State, 802 S.W.2d 28, 33 (Tex.App.—Corpus Christi 1990) (“The State is responsible for disclosing favorable evidence known by its agents, including police officers, even if the particular evidence is not known to the prosecuting attorney.”).
To summarize, the State violates a defendant’s right to due process when it actively or passively uses perjured testimony to obtain a conviction. Mooney, 294 U.S. at 112, 55 S.Ct. at 342, and Alcorta, 355 U.S. at 31, 78 S.Ct. at 105. Such a violation occurs whenever the prosecutor has actual or imputed knowledge of the perjury.[4] Giglio, 405 U.S. at 154, 92 S.Ct. at 766, Adams, 768 S.W.2d at 292.
IV.
A.
Simply stated, the issue presented in the instant case is whether knowledge of Officer Fragozo’s and Maria Sanchez’s perjured testimony can be imputed to the State. The State contends, “Fragozo’s conspiratorial conduct and subsequent perjury were part of a private vendetta, unrelated to his duties as a police officer.” Analogizing this situation to suits for tortious conduct under 42 U.S.C. § 1983, the State contends the government is not liable for an agent’s misconduct unless the conduct is “under color of law,” that is, unless the State is either aware of or promotes the misconduct. Thus, the State argues that knowledge of perjury is imputable to the prosecution only where police were acting exclusively in their capacity as agents of the State. In other words, the State contends that Officer Fragozo’s knowledge of the perjured testimony was not imputable to the prosecution because he was not a member of the “prosecution team” because he was not operating “under color of law.”
While there is no authority from this Court which addresses the State’s contention, the Supreme Court and the Fifth Circuit have held that government agents need not act exclusively in their capacity as agents of the State in order to act under color of law. See, Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), United States v. Tarpley, 945 F.2d 806 (5th Cir.1991); United States v. Davila, 704 F.2d 749 (5th Cir.1983), and, Brown v. Miller, 631 F.2d 408 (5th Cir.1980).
*482 In Screws, the defendants, a sheriff and two other peace officers, arrested the decedent and transported him to the county courthouse. As the decedent exited the police vehicle, Screws and the two other officers began to beat him with their fists and a blackjack. After knocking the decedent to the ground, Screws and the two officers continued to beat the decedent until he lapsed into a coma. The decedent died as a result of the beating. There was evidence that Screws held a grudge against the decedent and had threatened to “get” him. Id., 325 U.S. at 92-93, 65 S.Ct. at 1031.
Screws and the two officers were convicted of violating, inter alia, § 20 of the Criminal Code, 18 U.S.C. § 52, which prohibited an individual, while acting under color of law, from depriving another person of his constitutional rights.[5] On appeal, Screws contended he had not acted under color of law as intended by § 20 because he was performing his duty under state law, rather than federal law. Screws, 325 U.S. at 107-108, 65 S.Ct. at 1038. In addressing Screws’ contention, the Supreme Court initially explained that
... [t]he problem is not whether state law has been violated but whether an inhabitant of a State has been deprived of a federal right by one who acts under “color of any law.” He who acts under “color” of law may be a federal officer or a state officer. He may act under “color” of federal law or of state law.
Id. 325 U.S. at 108, 65 S.Ct. at 1038. The Supreme Court then clarified the meaning of the term “under color of law” as applied to actions by state officers:
... Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed "with the authority of state law, is action taken “under color of’ state law.
Id., 325 U.S. at 109, 65 S.Ct. at 1039 (quoting United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)). Holding that Screws and his co-defendants had acted under color of law, the Supreme Court concluded:
... We are not dealing here with a case where an officer not authorized to act nevertheless takes action. Here the state officers were authorized to make an arrest and to take such steps as were necessary to make the arrest effective. They acted without authority only in the sense that they used excessive force in making the arrest effective. It is clear that under “color” of law means under “pretense” of law. Thus acts of officers in the ambit of their personal pursuits are plainly excluded. Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it.
Screws, 325 U.S. at 111, 65 S.Ct. at 1040.
In Tarpley, the defendant was a deputy sheriff who learned of a past affair between his wife and the complainant. While off duty, Tarpley instructed his wife to call the complainant and invite him to the Tarpleys’ home. When the complainant arrived, Tarp-ley beat the complainant and threatened him with his pistol. During the beating, Tarpley told the complainant that he was a police sergeant and that “he would and should kill [the complainant] because he was a cop.” Id., 945 F.2d at 808. After the beating, Tarpley released the complainant but threatened to kill him if he reported the incident. Id. Tarpley then smashed the head lights on the complainant’s truck and, accompanied by two fellow officers, followed the complainant as he left town. Id. Tarpley was convicted of violating 18 U.S.C. §§ 241 and 242 which prohibited an individual while acting under color of law from depriving another person of his constitutional rights.[6]
*483 On appeal, Tarpley contended the evidence was insufficient to establish that he was acting under color of law. Id., at 808-809. In reviewing Tarpley’s contention, the Fifth Circuit first addressed the meaning of under color of law:
... “[U]nder ‘color’ of law means under ‘pretense’ of law_” [Moreover] “acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it” ... However, “acts of officers in the ambit of their personal pursuits are plainly excluded.”
Id., at 809 (quoting Screws, 325 U.S. at 111, 65 S.Ct. at 1040). However, the Court of Appeals explained that officials could act under color of law even if prompted by purely personal motives:
[It is] clear that whether a police officer is acting under color of law does not depend on duty status at the time of the alleged violation ... Nor does Screws mean that if officials act for purely personal reasons, they necessarily fail to act “under color of law” ... Rather, Screws held simply that individuals pursuing private aims and not acting by virtue of state authority are not acting under color of law purely because they are state officers.
Tarpley, at 809 (citations omitted).
The Fifth Circuit noted that Tarpley had not simply claimed to be a police officer and used his service weapon in the assault, but that he had claimed to have special authority by virtue of his status as a police officer. Id. Moreover, Tarpley enlisted the aid of fellow police officers, who participated in escorting the complainant out of town. The Court held that because “the presence of police and the air of official authority pervaded the entire incident” a jury could have concluded that Tarpley had acted under color of law despite his personal motivations. Id.
In Brown v. Miller, Miller was the mayor of a municipality and the majority owner of the local telephone company. Brown, the police chief, personally owed a debt to Miller’s telephone company. After Brown failed to pay his debt, Miller, on five separate occasions, removed Brown’s pay checks from the offices of the town hall and deposited them with his telephone company. Id., 681 F.2d at 410.
Brown sued Miller under 42 U.S.C. § 1983.[7] At trial, Miller admitted that he was able to gain access to Brown’s pay checks because of his position as mayor and that he would not have had such access had he not been the mayor. Id. After the district judge directed a verdict in favor of Brown, Miller appealed. The Court of Appeals affirmed holding:
Action taken “under color of’ state law is not limited only to that action taken by state officials pursuant to state law ... Rather, it includes: “Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law....”
Id., at 411 (citations omitted).
B.
In addition to the foregoing opinions from the Supreme Court and the Fifth Circuit Court of Appeals, there are several opinions from this Court holding that as long as the officer is acting in his capacity as a police officer, he is acting within the lawful discharge of his official duties. Guerra v. State, 771 S.W.2d 453, 461 (Tex.Cr.App.1988). This principle has also been applied to off duty police officers. Hafdahl v. State, 805 S.W.2d 396 (Tex.Cr.App.1990), and Isam v. State, 582 S.W.2d 441 (Tex.Cr.App. [Panel Op.] 1979). In Hafdahl, the defendant shot and killed an off duty police officer who stopped, on his way home, to investigate a traffic accident involving the defendant. We held that a rational trier of fact could have concluded that the decedent had been acting in the lawful discharge of his official duty. Id., 805 S.W.2d at 401. In Isam, we held that the defendant’s arrest by an off duty police *484 officer was within the lawful discharge of the officer’s duties. Id., 582 S.W.2d at 444. Moreover, a police officer may act under color of law even when his actions are unrelated to his official duties. See, Miller, 631 F.2d at 411. Compare, Selvage v. State, 680 S.W.2d 17, 21 (Tex.Cr.App.1984) (Held: Rational trier of fact could conclude that decedent deputy sheriff was acting in the lawful discharge of his official duty when he approached defendant at the request of store owner, even though the deputy sheriff initially entered store for personal business).
Furthermore, a police officer may act under color of law even when his actions deviate from his prescribed conduct. In Montoya v. State, 744 S.W.2d 15 (Tex.Cr.App.1987), the defendant was convicted of the capital murder of a police officer. On appeal, Montoya contended he was entitled to an instruction on the lesser-included offense of murder because his arrest was illegal and, therefore, the decedent was not acting in the lawful discharge of his official duty when murdered. Id., at 29. We affirmed the conviction, holding:
Whether [the decedent] was making a lawful arrest is not relevant to determining if [the decedent] was acting in the lawful discharge of his official duties. A police officer is still acting within the lawful discharge of his official duties when he makes an unlawful arrest, so long as he is acting within his capacity as a peace officer.
Id. See also, Davila, 704 F.2d at 751 (U.S. Border Patrol Agents acted under color of law when they sexually assaulted illegal aliens).
C.
The Court of Appeals’ holding that there was no imputed knowledge is in conflict with our decision in Ex parte Adams, 768 S.W.2d 281 (Tex.Cr.App.1989). In Adams, the witness identified someone other than the defendant in a police lineup. The witness was then informed, by the officer in charge of the lineup, that she identified the wrong person and was given Adams’ correct lineup number.
Id., 768 S.W.2d at 286. At trial, Adams requested a hearing to determine whether the courtroom identification was tainted by an improper lineup. During the hearing, the witness falsely testified that she had identified Adams in the lineup and that no one had influenced her identification. Id., at 291. The prosecutor, who had not been informed of the exchange between the witness and the police officer at the lineup, did not correct the witness’ perjury. Id. We held:
The Dallas police officer that “helped” [the witness] was by [the witness’] own admission in charge of the lineup. Consequently, as part of the investigating team his knowledge of [the witness’] lack of identification at the lineup and his assistance to her is imputed to [the prosecutor] ... Consequently, when [the witness] testified that she had identified the applicant in a lineup [the prosecutor] had an obligation to correct the perjured testimony.
Id., at 292.
In the instant case, the habeas judge expressly found that Fragozo perjured himself through his testimony at appellant’s trial and through his alteration of the tape recordings used against appellant. Additionally, Frago-zo had knowledge of Sanchez’s perjury by assisting her in fabricating the case against appellant. Clearly then, Fragozo had knowledge not only of his own perjury, but that of Sanchez as well.
The record clearly supports a finding that Fragozo was acting under color of law when he conspired against appellant. Frago-zo’s participation in the investigation was considerable. As the habeas judge found, Fragozo attempted to enlist Jiminez as a witness against appellant. Fragozo aided Sanchez in altering the tape recordings to appear that appellant was admitting to the arson when in fact he had no knowledge of the arson. Fragozo then instigated the criminal proceedings by approaching two separate arson investigators and informed them of Sanchez and provided one of the investigators with the altered tape recordings implicating appellant.[8] Finally, Fragozo officially *485 participated in the arson investigation by traveling with an arson investigator to the home of Luis Cantu, one of appellant’s employees and a potential witness. While in Cantu’s home Fragozo questioned Cantu about his knowledge of the fire and allegedly attempted to intimidate Cantu into implicating appellant.[9] Clearly, Fragozo’s accompanying the arson investigator to Cantu’s home and participating in the interrogation of Cantu was related to Fragozo’s role as a police officer. See, Miller, 631 F.2d at 411. While it may be true that Fragozo’s conduct was privately motivated “it is not significant ... that the misuse of power under color of state law was motivated solely for purely personal reasons or pecuniary gain.” Miller, 631 F.2d at 411. Consequently, Fragozo acted under color of law and was, therefore, a member of the prosecution team in the investigation of the instant case and as such his knowledge of the perjured testimony was imputable to the prosecution. See, Adams, 768 S.W.2d at 291-292.[10]
V.
A finding of perjured testimony alone does not establish a violation of the Due Process Clause of the Fourteenth Amendment. United States v. Agurs, 427 U.S. 97, 103-104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976), and Giglio, 405 U.S. at 154, 92 S.Ct. at 766. The perjured testimony must be material. Agurs, 427 U.S. at 103-104, 96 S.Ct. at 2397. The Supreme Court has announced the standard of materiality for perjured testimony is the harmless error standard. United States v. Bagley, 473 U.S. 667, 679 n. 9, 105 S.Ct. 3375, 3382 n. 9, 87 L.Ed.2d 481 (1985); Thomas, 841 S.W.2d at 403. In Adams, we applied the harmless error analysis enunciated by Tex.R.App.P. 81(b)(2) to cases involving perjured testimony.[11] Id., 768 S.W.2d at 292. Therefore, the use of perjured testimony will be found to be material unless a reviewing court is convinced beyond a reasonable doubt that the perjury did not contribute to the conviction or punishment.
In finding of fact 6, the habeas judge found:
Maria Sanchez and Chris Fragozo collaborated together and without their testimony and the altered tapes, there is insufficient evidence to sustain a finding of guilt in this case.
While this Court is not bound by the findings of a habeas judge in a habeas corpus proceeding, where the findings are supported by *486 the record, they should be accepted by this Court. Ex parte Brandley, 781 S.W.2d 886, 887 (Tex.Cr.App.1989). Here, the findings of the habeas judge are supported by the record, thus they will be accepted. In light of finding of fact 6, we cannot determine beyond a reasonable doubt the perjured testimony made no contribution to appellant’s conviction. Rule 81(b)(2). Consequently, we hold the perjured testimony was material.
Accordingly, the judgment of the Court of Appeals is reversed, appellant’s conviction is set aside and the case is remanded to the trial court.
WHITE, J., not participating.

. Appellant's one ground for review states:
The court of appeals erred in holding that the Bexar County District Attorney's Office lacked imputed knowledge of the perjury committed by its witness Mary Sanchez, because San Antonio police officer Chris Fragozo collaborated with her in committing this perjury.

. All emphasis is supplied unless otherwise indicated.

. As will be discussed infra, knowledge of perjured testimony is imputable to the prosecution where such knowledge is possessed by anyone on the “prosecution team,” which includes both investigative and prosecutorial personnel. Adams, 768 S.W.2d at 292. However, where the perjured testimony is not known by any member of the prosecution team, knowledge of the perjury is not imputed and the Due Process Clause of the Fourteenth Amendment is not implicated. Mooney, 294 U.S. at 112, 55 S.Ct. at 342 and, Giglio, 405 U.S. at 153, 92 S.Ct. at 766. Because of the result reached in this opinion, we need not decide whether the Texas Constitution provides greater protection.

. In affirming appellant’s conviction, the Court of Appeals relied upon on Huffman, 479 S.W.2d at 69-70 and Cook, 423 S.W.2d at 314 and held that appellant was not entitled to relief because there was no "showing that the State knowingly used false testimony.” Castellano, slip op. pg. 3 (emphasis in original). To the extent the Court relied upon Huffman and Cook to require actual knowledge, that reliance is misplaced because both decisions predate Giglio. It is now settled law that a prosecutor need not have actual knowledge of perjured testimony in order for there to be a due process violation. Giglio, 405 U.S. at 154, 92 S.Ct. at 766; Adams, 768 S.W.2d at 291; and Duggan, 778 S.W.2d at 468.

. § 20 stated in pertinent part that: "[w]hoever under color of any law ... willfully subjects, or causes to be subjected, any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution and laws of the United States ... shall be fined ... or imprisoned. ...”

. 18 U.S.C. § 242 states in pertinent part that "[w]hoever, under color of any law ... willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges or immunities, secured or protected by the Constitution or laws of the United States ... shall be fined ... or imprisoned_"

. 42 U.S.C. § 1983 provides in pertinent part:
Every person who, under color of any statute ... of any State, Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

. The State acknowledges:
Additionally, Lieutenant Raymond Trevino with the San Antonio Police arson squad, testi *485 fied that he was first contacted by Fragozo concerning the case on November 2, 1984. [Record citation omitted]. Investigator Alfred Castro, testified that he spoke to Fragozo on November 7, 1984, and as a result of that conversation, interviewed Mary Sanchez and took possession of the tape recording. [Record citation omitted].
State’s brief on appellant’s petition for review, Pg- 4.

.The State acknowledges:
... Fragozo’s only apparent involvement in the "investigation” of the arson occurred after the fire when the latter went to the home of Luis Cantu, an employee of the appellant. Cantu alleged, and Fragozo denied, that the latter attempted to intimidate Cantu into giving a statement, implicating the appellant....
Castro also testified that Fragozo assisted in the investigation and exchanged information with the investigator [Record citation omitted]. He accompanied Castro to Luis Cantu’s home, although there was no mention in Castro’s testimony of any effort to intimidate Cantu.
State’s brief on appellant’s petition for review, pg. 5.

. The record reveals another basis for imputing knowledge to the State. At the writ hearing, Jiminez testified that she and Sanchez met with an assistant district attorney prior to appellant's trial. Jiminez informed the prosecutor that she believed Sanchez was lying. While Jiminez’s expressions of doubt concerning Maria Sanchez’s veracity might not serve as actual knowledge on the part of the prosecutor, they serve to impute knowledge to the prosecutor. As previously noted, ”[i]t does not matter whether the prosecutor actually knows that the evidence is false; it is enough that he or she should have recognized the misleading nature of the evidence." Duggan, 778 S.W.2d 465, 468.

. Tex.R.App.P. 81(b)(2) states:
If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.