# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00121-CR

**Mark Dietz, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT NO. 0994422, HONORABLE CHARLES F. CAMPBELL, JR., JUDGE PRESIDING

Mark Dietz appeals his conviction for impersonating a public servant, *see* Tex. Pen. Code Ann. § 37.11 (West Supp. 2001), for which he was sentenced to two years' probation. He complains on appeal that there is a fatal variance between the indictment and the proof at trial, and that the State introduced false evidence. We will overrule both issues and affirm the judgment of the trial court.

## FACTUAL BACKGROUND

### *The Impersonation Incident*

In the early morning of June 19, 1999, bail enforcement agent Mark Dietz attempted to apprehend Nabor Rangel, who had failed to appear on a scheduled court date after posting bond. According to Dietz, a confidential source had informed him that Nabor Rangel could be found at the

apartment of his ex-wife, Ida Rangel. Dietz testified that he typically performs apprehensions with a partner, but on that day his partner was ill and Dietz's seventeen-year-old son was with him. They drove to the Booker T. Washington apartment complex but were unable to locate the address. When Dietz's son spotted a police car nearby, they decided to ask the officer for assistance in locating the apartment.

According to Angelique Hooper, an officer with the Austin Police Department, Dietz identified himself as a Travis County Sheriff's deputy and showed her his badge. Dietz told her that he had a felony warrant for Nabor Rangel that he needed help serving. Hooper testified that it was customary for Austin police officers to help other law enforcement officers serve felony warrants and so she directed him to the apartment. Backup officer Julie Schroeder testified that she and Hooper began doubting that Dietz was a law enforcement officer because of his behavior. According to the officers, Dietz had a "cocky" and "authoritative" attitude, was "furtive" and "jumpy," and had only a very poor quality photograph of the alleged "suspect." Dietz's behavior soon made it clear to the officers that he was not a sheriff's deputy but rather a bail bondsman or bounty hunter. After they learned from the dispatcher that Dietz had only a misdemeanor warrant, the officers refused to assist him further.[1]

Both officers testified that they stayed back while Dietz kicked at the door and forced his way past Ida Rangel into her apartment. Ida Rangel testified that Dietz told her at the door that he was a police officer. As he went in the apartment, he was brandishing a gun and yelling on his cell

---

[1] Officer Schroeder testified on direct that Austin Police Department officers will not assist in a forced entry apprehension of a suspect where only a misdemeanor warrant is involved.

2

phone. Ida testified that a man had called the apartment at six that morning saying he had a Federal Express delivery for Nabor Rangel. She informed him that Nabor Rangel did not live at the apartment, but the calls had continued.

Ida Rangel's relatives Sara Figueroa and her husband Ruben Hernandez were staying with her in the apartment; Hernandez testified that Dietz came upstairs into the room where they were sleeping with their three children. He kicked their door open and pointed a gun at Hernandez demanding to know if he was Nabor Rangel. Hernandez was frightened for himself and for his children and wife. Ida Rangel's ten-year-old son was also in the apartment. He testified that he was in the living room with his mother when Dietz kicked his way into the house and that he saw Dietz point the gun at Hernandez. Ida Rangel testified that when he came downstairs, Dietz was "real angry" and he appeared "crazy." When he could not locate Nabor Rangel, he left the apartment; on his way out, he insulted Ida Rangel, a Puerto Rican U.S. citizen, calling her a "f***ing Mexican."

Dietz presented a very different version of the incident. According to his testimony, he never represented himself as a sheriff's deputy or police officer to Hooper, Schroeder or Ida Rangel; rather, he testified that he clearly indicated that he was a bail enforcement agent. According to Dietz, no one would have assumed that he was an officer based on his appearance. He went out of his way to describe what he was wearing, which, if true, would have borne no resemblance to a typical police or sheriff uniform.

Dietz testified that when he got the call that Nabor Rangel was allegedly at his former wife's apartment, he and his son had been working on their ranch in Johnson City. He had not wanted to take the chance of missing Rangel, so he came straight from the ranch without changing

3

his clothes. He testified that he had been castrating farm animals and clearing brush, so the shirt he was wearing was covered with animal blood. Dietz stated that he had not shaved in days, that he was wearing boots up to his knees with his jeans tucked into the boots, and that he had on a black hat with a turkey feather in it. Neither police officer remembered seeing blood on Dietz's clothes. Hooper testified that Dietz was dressed in jeans and a denim shirt, and looked "decent." She did not see any blood on his clothes and did not get the impression that he had been working with animals or hauling brush.

Dietz attempted to discredit the officers' testimony by implying that they should have known that he was not a sheriff's deputy or other law enforcement officer. He introduced into evidence the badge he was wearing that day and cross-examined Hooper regarding its appearance. When Hooper was able to closely examine the badge during the trial, she read the words "Fugitive Recovery." She testified that on the morning of the incident, however, Dietz flashed the badge from inside his vehicle, which was six or seven feet away from her. Moreover, she did not scrutinize the badge because she initially took Dietz at his word when he told her that he was a sheriff's deputy. Had she inspected the badge, she would have noticed that it did not resemble a police officer's or sheriff's badge. Dietz also testified that he gave the officers his business card, which clearly indicated his employment with a bail enforcement agency called "Stealth Hunters." Officer Hooper testified, however, that Dietz never showed her his card.

Dietz also contradicted the account of his entry into Ida Rangel's home and his failed attempt to apprehend Nabor Rangel. He admitted that he was carrying a gun, but explained that he has a concealed handgun license, that his gun is always concealed, and that it was concealed during

4

this incident. He also disputed that he pointed the gun at any of the residents of the apartment. Dietz claimed that he did not force his way into the apartment, but rather that Ida Rangel consented to let him come inside.

Dietz was charged in a three-count indictment for alleged offenses arising out of the June incident. They included burglary of a habitation with intent to commit aggravated assault with a deadly weapon, *see* Tex. Pen. Code Ann. § 30.02 (West Supp. 2001); aggravated assault with a deadly weapon, *see id.* § 22.02(a)(2) (West 1994); and impersonating a public servant, s*ee id.* § 37.11 (West Supp. 2001). After a bench trial, Dietz was found guilty of only the less serious offense of impersonating a public servant.[2] The judge sentenced him to two years' imprisonment but suspended his sentence and placed him on probation. Dietz appeals the judgment and raises two issues. He argues first that a material variance exists between the indictment and the proof at trial and, therefore, the evidence is legally insufficient to sustain the conviction. Secondly, he contends that the State introduced false evidence at trial.

**DISCUSSION**

*Variance*

Section 37.11(a)(1) of the Penal Code provides that "[a] person commits an offense if he impersonates a public servant with intent to induce another to submit to his pretended official authority or to rely on his pretended official acts." *Id.* § 37.11(a)(1). The portion of the indictment

---

[2] Burglary of a habitation with intent to commit a felony is a first-degree felony, Tex. Pen. Code Ann. § 30.02(d) (West Supp. 2001); and aggravated assault is a second-degree felony, *id.* § 22.02(b) (West 1994). Impersonating a public officer is a third-degree felony. *Id.* § 37.11(b) (West Supp. 2001).

pertaining to the impersonation offense was descriptive of the incident. It states that Dietz "impersonate[d] a public servant with intent to induce another, to wit: Ida Rangel and Sara Figueroa and Ruben Hernandez and Angelique Hooper to submit to his pretended authority or to rely on his pretended official acts."[3]

At trial, Officer Hooper and Ida Rangel testified that Dietz explicitly told them that he was a sheriff's deputy or a police officer. Hernandez and Figueroa's testimony did not allege that Dietz impersonated an officer, only that he brandished his weapon in a threatening manner. Dietz argues that since the evidence shows that he told only two of the four individuals named in the indictment that he was a law enforcement officer, he cannot be guilty of violating section 37.11(a)(1) as to the other two. In essence, it is Dietz's contention that a fatal variance exists between the allegations in the indictment and the proof at trial. The sufficiency of the evidence to sustain a criminal conviction is measured by the elements of the offense as defined in a hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The court of criminal appeals recently explained the application of *Malik* in cases of alleged variances between the pleading and the proof:

> [W]e hold that when faced with a sufficiency of the evidence claim based upon a variance between the indictment and the proof, only a "material" variance will render the evidence insufficient. Thus, the hypothetically correct charge will take into consideration the fatal variance doctrine formerly expressed by this Court and today

---

[3] The indictment also accused Dietz of a violation of section 37.11(a)(2). *See id.* § 37.11(a)(2). When the judge announced his ruling from the bench, he made clear that he was basing his judgment as to Dietz's guilt based on a violation of section 37.11(a)(1) and not of section 37.11(a)(2). Moreover, the parties do not address section 37.11(a)(2). Therefore, we confine our opinion to an analysis under section 37.11(a)(1).

6

reaffirmed. Allegations giving rise to immaterial variances may be disregarded in the hypothetically correct charge, but allegations giving rise to material variances must be included.

*Gollihar v. State*, 46 S.W.3d 243, 257 (Tex. Crim. App. 2001) (footnote omitted).

The indictment informed appellant that he was accused of impersonating a public servant under section 37.11(a)(1). To violate section 37.11(a)(1), there must be a false assumption or pretension by a person that he is a public servant and overt action in that capacity coupled with the requisite intent. *See Tovar v. State*, 777 S.W.2d 481, 489 (Tex. App.—Corpus Christi 1989, pet. ref'd); *see also Boyett v. State*, 368 S.W.2d 769, 771 (Tex. Crim. App. 1963) (interpreting predecessor statutory provision). The prosecution proved both of these elements of the offense. Under Dietz's interpretation of the statute, however, the State also had to prove that Dietz impersonated himself as a public servant to each person that he intended to induce to submit to his pretended authority or to rely on his pretended official acts. The State asserts that it did not need to prove that Dietz impersonated himself to every person involved in the incident but that under the express terms of the statute, proof that Dietz impersonated himself to one person with the requisite intent to induce "another" to submit to his pretended authority was sufficient.

The plain language of the statute does not lend itself to the interpretation of section 37.11(a)(1) that Dietz urges us to adopt. By its terms, the statute is violated when an individual impersonates a public servant with the intent that someone rely on his pretended official acts or authority. *See id.* § 37.11(a)(1); *Tovar*, 777 S.W.2d at 489. The actor need not succeed in actually inducing anyone to submit to or rely on his assumed authority; all that is required is the impersonation and the intent. *See id.* § 37.11(a)(1); *Tovar*, 777 S.W.2d at 489. That such is sufficient to violate

7

section 37.11(a)(1) reflects the underlying purpose of the statute, which is to maintain public trust in law enforcement and government. *See generally* Russell G. Donaldson, Annotation, *"Acts as Such" Element of 18 USCS § 912, Making it a Crime to Pretend to be an Officer or Employee of the United States*, 55 A.L.R. Fed. 494 (1981) (discussing purposes of federal impersonation statute, which are to maintain public respect and goodwill for the government and government officials, and to maintain the dignity of government service). Every time someone falsely assumes governmental authority, he implicates the purpose of such statutes.

The purpose of section 37.11(a)(1) would be undermined if the State were required to prove that a defendant held himself out as a public servant to each person that he intended to induce to rely on or submit to his authority. For example, a person might impersonate a police officer to an office building security guard and order the evacuation of the building, intending thereby to induce everyone in the building to submit to his pretended authority. Neither logic nor the language of section 37.11(a)(1) requires that the impersonation be addressed to each individual in the building.

Dietz's primary objective was to get inside the apartment and search for Nabor Rangel, who Dietz thought was hiding inside. He accomplished this objective by impersonating himself as a sheriff's deputy to Officer Hooper and then as a police officer to Ida Rangel. Once inside, he brandished his gun and threatened Hernandez and Figueroa, thereby evidencing his intent that they submit to his pretended authority. The fact finder could reasonably conclude that his initial impersonation to Hooper and Ida Rangel was intended to induce everyone in the apartment to submit

8

to his pretended authority. Indeed, the trial court explained that Dietz's initial deception was the basis for his ruling that Dietz had violated section 37.11(a)(1) as set forth in the indictment:

> [I] believe that there is competent credible evidence from both police witness[es] and a civilian witness that this defendant did indeed represent himself as a member of the Travis County sheriff's office and that truthfully none of this would have unfolded the way it did if that hadn't happened. *The reason that it went awry is because of that initial deception. Had that initial deception not occurred, I don't think any of this would have unfolded the way it did.*

(Emphasis added.)

Dietz's initial deception set in motion an event that ultimately affected all of the people in the apartment that day. The indictment described the people that Dietz interacted with during the incident. It is of no consequence that Dietz did not explicitly tell Hernandez or Figueroa that he was a government official. Based on the plain language of the statute, we conclude that Dietz violated section 37.11(a)(1) as set out in the indictment when he impersonated himself as a sheriff's deputy to Officer Hooper and as a police officer to Ida Rangel to gain access to the apartment where he then threatened the named others so that they would submit to his pretended authority. We hold, therefore, that there is no variance between the allegations in the indictment and the proof at trial.

Even if a variance does exist, it is not a material one:

> A variance between the wording of an indictment and the evidence presented at trial is fatal only if "it is material and prejudices [the defendant's] substantial rights." When reviewing such a variance, we must determine whether the indictment, as written, informed the defendant of the charge against him sufficiently to allow him to prepare an adequate defense at trial, and whether prosecution under the deficiently drafted indictment would subject the defendant to the risk of being prosecuted later for the same crime.

*Gollihar*, 46 S.W.3d at 257 (quoting *United States v. Sprick*, 233 F.3d 845, 853 (5th Cir. 2000)). There is nothing in the record to indicate that the precise number of people to whom Dietz impersonated himself as a public servant was crucial to his ability to conduct his defense to the charged offense. Appellant argues that he faces the risk of being prosecuted again under a different indictment because the evidence was insufficient to prove the allegations in the indictment as to Hernandez and Figueroa. Even if Dietz were correct that the State's evidence failed as to Hernandez and Figueroa, Dietz faces no further prosecution because the indictment on its face constitutes evidence that he was charged with impersonating a public servant with respect to all four individuals. Moreover, the record indicates that Dietz was *tried* on the offense as to all four people. *See Gollihar*, 46 S.W.3d at 258 (stating that the "entire record, not just [the] indictment, may be referred to in protecting against double jeopardy in event of subsequent prosecution") (citation omitted). We conclude that any alleged variance is immaterial and should be disregarded in determining the sufficiency of the evidence under a hypothetically correct jury charge. Because appellant's challenge to the legal sufficiency of the evidence rests solely on an immaterial variance, if any, it is without merit.

### False Evidence

Dietz argues under his second issue that the State used false evidence to impeach his credibility at trial. At trial, Dietz testified on his own behalf and offered a different version of the June incident than that described by the State's witnesses. He also testified regarding his credentials as a professional bail recovery agent and emphasized the importance of his work. "Well, when people are arrested, they ultimately make bond through surety, and a great percentage of them don't go to court.

It's my job to locate them, find them and put them back in jail so they'll go answer to the judge." He asserted that law enforcement officials were aware of and respected the work done by bail recovery agents: "[The] police . . . were very receptive in that we were out there trying to do the right thing." Dietz asserted that he had been an agent since 1986 and that no one had ever questioned his credentials before this incident. He put evidence of these credentials before the trial court, specifically, his badge and a card that indicates he is a member of the "United States Professional Bail Bond Investigators Association."

After Dietz testified as to his experience, the State was permitted, over Dietz's objection,[4] to question him regarding his credentials. During the course of the questioning, the prosecutor brought out the fact that Dietz had testified before the grand jury that he had been a police officer with the Round Rock Police Department and that he had a private investigator's license. The State then offered Exhibits 23, 24, and 25 to show that Dietz's grand jury testimony was false.

Exhibit 25 was an affidavit by the custodian of records for the Round Rock Police Department stating that no employment records were found for Dietz. In his closing argument, the prosecutor stated: "Mr. Dietz lied about having been a police officer, and that's why the Court has an affidavit [certifying that] no business records from the Round Rock Police Department [had been found]." Dietz did not object to Exhibit 25 or to the closing argument.

---

[4] Dietz's objection on the ground of relevance was overruled by the court, which explained that Dietz's testimony on direct as to his experience made the State's questioning relevant. Dietz does not argue on appeal that the questioning or exhibits introduced by the State to contradict Dietz's testimony were improperly allowed on the ground of relevance. His challenge on appeal is only directed at the alleged "falsity" of the State's evidence.

On appeal, Dietz focuses on a letter to the prosecutor from RRPD's records supervisor. The letter confirms that no employment records had been found for Dietz; it then adds that Dietz had been a reserve officer with the department but that he was not there long enough to "be allowed to write reports, supplements, or citations," so he was not listed in their computer database. The letter was in the State's possession but the prosecutor did not file it with Exhibit 25 or introduce it at trial. Analogizing this to a prosecutor's knowing use of perjured testimony,[5] Dietz asserts that the State deprived him of due process by introducing the affidavit stating that Dietz had no employment records with RRPD when the prosecutor knew that Dietz had been a reserve officer there.

The State responds that by affirmatively stating "no objection," Dietz waived any error from the use of Exhibit 25. It also challenges Dietz's characterization of Exhibit 25 as false evidence; it suggests that more appropriately Dietz's argument is that the State failed to present a complete picture of Dietz's record with RRPD. The State further notes that the explanatory letter was contained in the prosecutor's trial notebook to which Dietz's attorney had access before trial. Dietz does not dispute that he had notice of the letter. Finally, the State contends that the evidence was not material. *See Ex Parte Castellano*, 863 S.W.2d 476, 485 (Tex. Crim. App. 1993) (stating that the use of perjured testimony is presumed material "unless a reviewing court is convinced beyond a reasonable doubt that the perjury did not contribute to the conviction or punishment"); *Duggan v. State*, 778 S.W.2d 465, 469 (Tex. Crim. App. 1989) (explaining that "[b]ecause false evidence

---

[5] Appellant cites primarily *Giglio v. United States*, 405 U.S. 150 (1972), and *Mooney v. Holohan*, 294 U.S. 103 (1935).

corrupts the truth seeking function of trial, a new trial will be necessary unless the false evidence does not violate the accused's right to due process").

Setting aside any issue of preservation of error, we do not find that the State used false evidence. Dietz does not contend, and we do not find, that Exhibit 25 was false on its face; nor does the explanatory letter *make* the affidavit false. At most, the letter reveals that the affidavit was incomplete. The omitted letter must be examined in the context of this case. Whether Dietz had been a police officer with RRPD was not at issue in the case. Dietz created an issue regarding his employment with RRPD by testifying before the grand jury about his experience as a police officer; the State offered Exhibit 25 in response to this testimony as a way to impeach Dietz's credibility in a case that came down to Dietz's word against the word of all of the State's witnesses.

Dietz was in the best position to present an accurate picture of his own experience as an officer, which he did on redirect examination by explaining that no records were found because he was a reserve officer with RRPD, but that he had been with the department for several months. Thus, Dietz was able to present the same information as that contained in the letter. Moreover, Dietz apparently created any inaccuracy regarding his police experience by failing to specify that he was a reserve officer with RRPD. Furthermore, the letter was consistent with the affidavit because it confirmed that no employment records existed regarding Dietz. Therefore, the affidavit does not constitute false evidence.

In the case of a constitutional error such as the use of perjured testimony, we must reverse a judgment of conviction unless we are convinced beyond a reasonable doubt that the error did not contribute to the conviction. Tex. R. App. P. 44.2(a); *Ex Parte Castellano*, 863 S.W.2d at

13

485. In this case, because the evidence was not false, we need not apply the harmless error standard contained in rule 44.2(a).

Dietz also asserts that Exhibits 23 and 24 constituted false evidence. The State used these exhibits to contradict Dietz's testimony to the grand jury that he became a licensed private investigator after the incident and that he had received a certificate indicating that he was licensed on August 24, 1999. At trial, the State offered two affidavits from the Texas Commission on Private Security.[6] One affidavit stated that as of September 21, 1999, the Commission had not located any records indicating that Dietz was licensed. The second affidavit stated that a search of the Commission's records revealed that Dietz was not licensed as a private investigator but that his application for a license had been filed on or about September 23, 1999, just days after his September 17 grand jury testimony; the application was incomplete as of January 21, 2000, the date of the affidavit. At trial, the State used the two affidavits to show first, that Dietz's assertions to the grand jury that he was licensed were false statements, and second, that Dietz's application for a license was still incomplete.

Dietz's attorney affirmatively stated that he had no objection to the exhibits when the prosecutor offered them. Dietz argues on appeal, however, that his testimony before the grand jury was that he had a "certificate of completion" which he *equated* with being licensed. Dietz's argument is similar to his argument regarding Exhibit 25: He does not argue that the exhibits offered by the prosecutor were on their face false or inaccurate, but rather that the exhibits created a false

---

[6] The Commission is the state agency that regulates and licenses private security officers. *See* Tex. Occ. Code Ann. § 1702.001-1702.389 (West 2000).

14

impression in light of the certificate of completion. The certificate, however, was issued by a private company, not the Commission. Nor does it indicate that it is a license; it merely states that it is a certificate of completion of a "level one training course." Moreover, the fact that Dietz applied for a license with the Commission days after his grand jury testimony undercut his position at trial, which was that he believed that the certificate was equivalent to a license. Dietz's unreasonable belief had no effect on the accuracy of the exhibits.[7] We do not find that the State introduced false evidence by way of Exhibits 23 and 24. Therefore, we overrule Dietz's second issue.

## CONCLUSION

Having overruled both of Dietz's issues, we affirm the judgment of the trial court.

---

\_

Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Puryear

Affirmed

Filed: December 6, 2001

---

[7] Dietz also asserts that the Commission on Law Enforcement Officer Standards and Education had records on file pertaining to Dietz, specifically documentation that Dietz had received a proficiency certificate as a peace officer. Dietz further argues that this information, maintained by a state agency, should be imputed to the prosecutor as the State's representative at trial. The State's efforts to impeach Dietz concerned Dietz's testimony to the grand jury that he had received a private investigator's license. We therefore do not address Dietz's arguments concerning documentation of Dietz's proficiency as a peace officer.

Publish