WR-47,593-02
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 8/7/2015 2:44:15 PM
Accepted 8/7/2015 3:00:37 PM
ABEL ACOSTA
CLERK

No. WR-47,593-02

IN THE COURT OF CRIMINAL APPEALS OF TEXAS, AT AUSTIN

RECEIVED
COURT OF CRIMINAL APPEALS
8/7/2015
ABEL ACOSTA, CLERK

**Ex parte Randal Franklin Caraway**

Applicant

*Habeas Corpus* Proceeding under Article 11.07, *et seq.*, C.Cr.P., in Case Number 19072B, from the 91st District Court of Eastland County

## Motion for Remand for Evidentiary Hearing

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

COMES NOW, Randal Franklin Caraway, Applicant, by and through his attorneys, John G. Jasuta and David A. Schulman, and respectfully files this Motion for Remand for Evidentiary Hearing, and would show the Court:

I

Applicant filed an application for a writ of *habeas corpus* in Cause Number 19072B, in the *habeas* court, on June 14, 2014. The application was transferred to the Court of Criminal Appeals, received on July 11, 2014 and docketed as indicated above. On August 15, 2014, a Supplemental Clerk's Record was received at the Court of Criminal Appeals containing the *habeas* court's Findings of Fact and Conclusions of Law, which had been signed

by the *habeas* court on August 8, 2014, to which Applicant objected on March 10, 2015, with notice of those objections being filed with this Court the same day.

I

Applicant asserts that the *habeas* court improperly denied him the opportunity to present his claims in a live evidentiary hearing. In that regard, Applicant would show the Court that, in his *habeas corpus* application, he stated facts which, if true, would entitle him to relief, in multiple respects:

A

Applicant's allegation as to the recantation of incriminating trial testimony is supported by the Jenkins affidavit, submitted as Exhibit "C" to the habeas application. The State's answer created contested factual issues, but did not purport to resolve the issue without the making of credibility choices, more suitable after confrontation.

The State made no effort to explain Jenkins' reduced sentence, which he swore was the payoff for the perjured testimony. That the individuals named as those who coerced the testimony have denied the truth of the allegation, again, does nothing but create a factual issue requiring resolution.

Counsel for the State clearly misunderstood Dr. Peerwani's affidavit (attached as Exhibit "F" to the *habeas* application) and the State's answer, and findings based on that answer, misstated the substance of that affidavit. In the 2013 affidavit Dr. Peerwani did not state the cause of death as manual strangulation but, instead, stated that, given current and modern medical knowledge and procedures, the cause of death could not be determined.

It is true that Dr. Peerwani testified at trial that his identification of the cause of death at trial was due to history, which went unexplained. However, the State's response missed the point of Dr. Peerwani's affidavit which was that his trial testimony was wrong, and would not be the same today, given modern medical protocols. According to Dr. Peerwani, he could not, given those modern protocols and procedures, use what others told him in arriving at a scientific conclusion and his testimony would not be that which was offered at trial.

Provided with the opportunity in a live evidentiary hearing, Dr. Peerwani will testify that the trial testimony that the cause of death was homicide and the method was manual strangulation was based entirely on what he had been told by involved law

enforcement officers and that neither would have been made but for that improper intervention. The science, Dr. Peerwani will also testify, could not show either cause of death or method of death and should not have been given because it was false testimony, as it was based on unsupportable hearsay.

The State's answer somewhat disingenuously states that the evidence at trial showed that Dr. Peerwani could not have come up with the conclusion that there had been manual strangulation unless someone told him, when that statement also totally misses the point. At trial, notwithstanding the lack of scientific support, Dr. Peerwani was allowed to give an expert scientific opinion that there was a homicide and that it had been caused by manual strangulation. In fact, as will be shown in testimony, following modern protocols, Dr. Peerwani, and other modern pathologists, do not speak with anyone who has any interest in the conclusion drawn. Such "expert" testimony could not be given today because it was not based on any scientific enquiry or expertise.

It is, perhaps, only coincidental, that the autopsy was performed on October 5, 1994, with law enforcement officers Preston and White present, and it was the next day that Preston wrote out the confession for Applicant to sign. Thus, at the time

4

of the autopsy, Applicant had not confessed to anything, making any "history" suspect, at best, and, possibly, a complete fabrication. The "history" was the opinion of law enforcement, and only that. It was not science.

Through its answer to the *habeas* application, the State ignores the fact that, given the advances in medical technology and procedures, Dr. Peerwani's testimony that there was a homicide would not be given, that his evidence that the method of death was manual strangulation would never have been heard by the jury, and, therefore, the testimony he actually gave at trial was false testimony.

Dr. Peerwani's current affidavit and his proposed testimony based on that affidavit clearly raise factual issues requiring resolution through evidentiary methods, and not unsupported credibility choices based on denials by the State without support.

C

The State's answer also neglected, and did not mention the additional medical evidence on this topic, all of which requires proper resolution of the issue. Two forensic pathologists have sworn that the evidence which was heard by the jury would not be given today because it is unsupported by medical examination.

Modern medical protocols simply do not allow for the interjection of the opinions of others, and certainly not police officers, into the medical examination and the conclusions to be drawn from that examination.

D

Additionally, the State either ignored or failed to understand and acknowledge, that additional "evidence" from Dr. Peerwani, including demonstrations of manual strangulation and discussions of how long victims would struggle and retain consciousness until death would ensue, would not have been admissible at trial, as it would not have been relevant to any issues before the jury. The State was able, due to the introduction of this spurious evidence, to argue that Applicant's confession was "consistent with the medical evidence" (RR Vol. 5, PP. 523-524). The truth is that the "medical evidence" presented at trial was false, based as it was on the statements made to the pathologist by law enforcement officers.

E

The State argued in its response that there is no evidence showing a violation of ***Brady v. Maryland***, 373 U.S. 83, 1963). The State did not respond, however, to some of the ***Brady***

violations alleged in the *habeas corpus* application. Thus, several of the State's failures to provide exculpatory and favorable evidence to defense counsel remain unexplained. Resolution through appropriate means is required, and the most appropriate means would be a live evidentiary hearing.

An example is found regarding the statement made to authorities by Jessica Bryan, the deceased's daughter, who informed police that she, and Applicant, had arrived home at 9:27 p.m., and that she had awakened three times during the night, on each occasion observing Applicant alone and awake at the kitchen table. During one of those times she heard Applicant arguing with someone, took the phone, and spoke with her mother. The failure to provide this information to defense counsel remains unexplained.

Another example of a ***Brady*** violation to which the State failed to respond is found in the written notes of the interview of Jessica Bryan in which it is stated that the deceased was at Roy Parker's house when Jessica spoke with her. The State put on evidence, at trial, that the deceased was next door, at Shawna Rhyne's house until she returned home. That evidence was directly contradicted by the notes which were never revealed to the defense, yet the

State offered no response to allegations in the *habeas* application pertaining to Bryan's notes, and the allegation remains unresolved.

Yet another example which has not been disputed is that the deceased's father reported to police that he had spoken with Shawna Rhynes, who told him that she had last seen the deceased at 9:00 p.m. on the night of her disappearance. The State put Shawna Rhynes on the stand to testify that she walked the deceased home after midnight and left her fighting with Applicant, despite the fact that counsel for the State knew Shawna had told the deceased's father something entirely different. This report was not given to the defense, and most certainly was never shown to the jury. The failure to provide this information to defense counsel remains unexplained, despite its contradiction of the testimony of one of the State's star witnesses. Only through presentation of evidence at a live evidentiary hearing can this explanation be obtained, and complete and fair resolution achieved.

F

The State disputes trial counsel Sanov's affidavit as not based on recollection. Trial counsel Sanov swore to his usual practices at the time in question, and those statements of his practices have

not been contradicted by the State. His statement is nothing more than an assertion that he has no reason to believe that he would have failed to act in accordance with his usual practices, which would have included investigating facts which would have benefitted his client. What Sanov's statements are not is "rank speculation."

The Sanov affidavit, when combined with that from Mr. Escovedo, is an excellent example of a ***Brady*** violation. Sanov stated in his affidavit that, had he seen the note referring to Escovedo, he would have contacted him as a part of his investigation, according to his usual practices at the time. Mr. Escovedo swore that no one contacted him. Mr. Sanov is not guessing, he is reciting his history, his usual course of practice and his belief that he was not given this information because he failed to act in his usual manner by investigating it.

If it does nothing else, the Sanov affidavit creates factual issues which require resolution by actual investigation and evidentiary presentation, eschewing speculation. Sanov's evidence should be accorded the same respect the State wishes accorded to that of Mr. Siebert, that he had an open file policy, despite the

9

Seibert's admission that he had no recollection of the exhibits.[1]

According equal respect to the evidence from the sources demonstrates, once again, the need for a genuine evidentiary hearing.

G

The evidence before the *habeas* court clearly demonstrated inconsistencies in the State's evidence, including whether Applicant actually directed the detectives to the body. The State referred in its answer, on multiple occasions, to the confession and the "fact" that Applicant showed the officers where the body was hidden. Interestingly enough, this was not stated in Kenneth Preston's initial memo describing the discovery of the body. In "OFFENSE/INCIDENT REPORT MEMO # 941015" it states:

> At approximately 10:30 PM on 10/04/94 Cisco Police Department Det. Sgt. Kenneth Preston and Chief Fairbanks were directed to a trash pit approximately 4 miles southwest of Cisco. It was there that the semi-nude body of a white female was found deceased. The body was wrapped in some type of blanket. The body is believed to be that of Tamiy Deneen Bryan, white female, 30 years of age, which was reported missing since

---

[1] Interestingly, the record shows Mr. Siebert's assertion that no evidence was not shown to Mr. Sanov during this open file review is false. Two documents, dated October 24, 1994, and February 9, 1995, were revealed to counsel on the third day of trial (RR Vol. 4, PP. 275-281). These documents related to matters which went to the heart of Applicant's defense, just as the matters discussed herein, and they had been in the State's file for fifteen months. Clearly, contrary to the affidavit of Mr. Siebert, not everything within the State's file was revealed to Mr. Sanov.

*09/27/94.* The body is believed to have been dumped there by suspect **#1** after being carried there by the suspect in the above described vehicle.

Oddly enough, no mention is made of either Applicant by name, or of Suspect #1, being the person who "directed" the maker of that report to the location, seemingly an important fact. If "Suspect #1," or Applicant, had directed the search, why was the body only "suspected" of having been left there by Suspect #1?

Why doesn't the report assert that Applicant had confessed and was the person who led the police to the body? The only reasonable explanation is that Applicant had not confessed and had not led the police to the body. Despite this inconsistency going directly to the heart of the State's answer, no true investigation was had through the one traditional method available to *habeas* courts allowing for presentation, and scrutiny, of reliable evidence - a live evidentiary hearing.

## H

There are multiple examples of the failure of the police to reveal evidence contradictory to the theory by which Applicant would be held accountable. There is even a phone slip from a police chief of a neighboring jurisdiction to the investigators in this case, clearly showing that there was a witness to the deceased's intoxication the alleged night of the murder.

11

The evidence contained in that note was contrary to the State sponsored evidence that there were no drugs and an inconsequential amount of alcohol in the deceased's body at the time of death. Nevertheless, the State maintained in its answer that, it is "unclear if there was a failure to disclose" this information. The State's answer, therefore, demonstrates the need for a hearing at which it can show that it did divulge information directly contrary to its theory of the case.

The actual facts, when presented in a live evidentiary hearing, will show that the absence of drugs and alcohol in the body, if true, weighed totally against Applicant killing the deceased and disposing of the body the night of the killing, as the State presented the case to the jury. The evidence actually shows that the deceased did not die that night and maybe even that Mr. Escovedo's evidence, also unrevealed, was true.

It is clear that evidence exists that there were multiple instances of non-revelation of material information to Mr. Sanov given his affidavit, as well as, perhaps, the State, if their claim of not having the evidence found in the police files is believed. All of this is, of course, inconsequential, because the police's failure to divulge exculpatory evidence is attributed to the prosecution team.

12

*Kyles v. Whitley*, 514 U.S. 419, 437-438 (1995); *Ex parte Chavez*, 213 S.W.3d 320, 325 (Tex.Cr.App. 2006); *Ex parte Mitchell*, 977 S.W.2d 575, 578 (Tex.Cr.App. 1997); *Ex parte Castellano*, 863 S.W.2d 476 (Tex.Cr.App. 1993); *Ex parte Adams*, 768 S.W.2d 281 (Tex.Cr.App. 1989).

II

Much has been written about the necessity of confrontation in the search for truth, with a recognition that the courtroom is that place where that search is conducted.

> The courtroom is the crucible of the law, where the fire of litigation tests the intellectual and political forces that inform social policy. Discovery - the process by which litigants identify and assemble their evidence - provides the fuel for the fire.

*James Gibson, **A Topic Both Timely and Timeless**, 10 RICH. J.L. & TECH. 49 (2004). Our literature and case law are replete with references to the "crucible" of the courtroom.

Members of the Supreme Court of the United States use it often. Regarding the Confrontation Clause, for example, the Court recently wrote:

> To be sure, the [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. . . . Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial

because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes."

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 312 (2009). Along that line, in one its most landscape-changing Confrontation Clause cases, the Court wrote:

> Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." Certainly none of the authorities discussed above acknowledges any general reliability exception to the common-law rule. Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined. Cf. 3 Blackstone, Commentaries, at 373 ("This open examination of witnesses . . . is much more conducive to the clearing up of truth"); M. Hale, History and Analysis of the Common Law of England 258 (1713) (adversarial testing "beats and bolts out the Truth much better").

*Crawford v. Washington*, 541 U.S. 36, 61-62 (2004). Similarly, more than forty years ago, Justice Marshall, joined by Justices Douglas and Brennan, wrote, albeit in dissent, that "In our system of justice, the right of confrontation provides the crucible for testing the truth of accusations . . . ." *Arnett v. Kennedy*, 416 U.S. 134, 214-215 (1974)(Marshall, J., dissenting). Also, seventy years ago, Justice Murphy, defending the right of the Associated

14

Press to disseminate the news, wrote generally that evidence, unless undisputed, "should be thoroughly tested in the crucible of cross-examination and counter-evidence." *Associated Press v. United States*, 326 U.S. 1, 57-58 (1945)(Murphy, J., dissenting).

### III

The role of the trial court in *habeas corpus* matters brought pursuant to Art. 11.07, § 3, is that of the fact-finder. The ultimate decision is to be made by the Court of Criminal Appeals, guided by the informed findings and recommendation of the trial court. Applicant asserts that the only way the Court can properly assist the Court of Criminal Appeals in its investigation and truly resolve the question of whether the State violated the requirements of *Brady* is to schedule a live evidentiary hearing, at which time Applicant would be able to introduce live testimony supporting his claims.

### IV

Applicant would suggest that, due to the time required to obtain witnesses and ensure their presence, as well as to prepare for a full and complete hearing, the hearing be scheduled no less than sixty (60) days from the date of the setting of the hearing.

# Prayer

WHEREFORE, PREMISES CONSIDERED, Applicant, Randal Franklin Caraway, respectfully prays that this Honorable Court will remand this cause to the trial / *habeas* court so that a live evidentiary hearing can be held, at which time Applicant can present live testimony in support of his claims; and, after such hearing and upon proper consideration by the Court of Criminal Appeals, Applicant will be granted the relief to which he is entitled.

Respectfully submitted:

**John G. Jasuta**
Attorney at Law
State Bar No. 10592300
lawyer1@johnjasuta.com

**David A. Schulman**
Attorney at Law
State Bar No. 17833400
zdrdavida@davischulman.com

1801 East 51st Street, Suite 365-474
Austin, Texas 78723
Tel. 512-474-4747
Fax: 512-532-6282

Attorneys for Applicant

**Certificate of Compliance and Delivery**

This is to certify that: (1) this document, created using WordPerfect™ X7 software, contains 3,234 words, excluding those items permitted by Rule 9.4 (i)(1), Tex.R.App.Pro., and complies with Rules 9.4 (i)(2)(B) and 9.4 (i)(3), Tex.R.App.Pro.; and (2) on August 6, 2015, a true and correct copy of the above and foregoing "Motion for Remand for Evidentiary Hearing" was transmitted via the eService function on the State's eFiling portal, to John R. Saringer (saringer@wagstafflaw.com), attorney pro tem, counsel for the State of Texas.

_____
**John G. Jasuta**