

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-22-00197-CR

Gilbert **CANTU**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 175th Judicial District Court, Bexar County, Texas
Trial Court No. 2019CR8797
Honorable Catherine Torres-Stahl, Judge Presiding

Opinion by:    Lori I. Valenzuela, Justice

Sitting:        Beth Watkins, Justice
                Lori I. Valenzuela, Justice
                Sandee Bryan Marion, Chief Justice (Ret.)[1]

Delivered and Filed: August 30, 2023

AFFIRMED

A jury convicted appellant, Gilbert Cantu ("Cantu"), on four counts of aggravated sexual assault of a child. The trial court found the enhancement allegation to be true and assessed punishment on each count at twenty-five years' confinement to run concurrently. We affirm.

---

[1] The Honorable Sandee Bryan Marion, Chief Justice (Retired) of the Fourth Court of Appeals, sitting by assignment of the Chief Justice of the Texas Supreme Court. *See* TEX. GOV'T CODE §§ 74.003, 75.002, 75.003.

**BACKGROUND**

Nine-year-old A.C.[2] testified she lived with her mother (Sandra) and her step-father. She said that when she was about five years old, she was at her paternal grandmother's (Letty's) house where she would go to play with her cousins. A.C. said Letty's husband and son lived with Letty. Cantu is Letty's son and A.C.'s biological father. A.C. testified she would go to Letty's house for two days over a weekend, and she would sleep in the living room.

A.C. said that, on the days of the assault,[3] only she and Cantu were in the house, although she later said everyone else was asleep in the house. A.C. said Cantu "forced [her] to sleep in his bedroom." She said Cantu "hurt her for the rest of the night, and he couldn't [sic] let [her] sleep." A.C. testified Cantu touched her under her clothing and he put his finger inside her "butt." She later clarified that he also put his mouth on her bottom. She answered "no" when asked if Cantu put his tongue in her bottom the same way he put his finger in her bottom. But she also stated he moved his tongue around and it hurt her. A.C. said Cantu touched her only on her bottom and only with his tongue and finger and no other part of his body touched her body. She said he did the same thing to her the next day as well.

A.C. said she told both Letty and Sandra what happened. A.C. said she told Sandra that Cantu "kept bothering [her] for the rest of the night. He put his finger in my bottom and he put his tongue on my bottom and he wouldn't let me sleep." Sandra then told her mother and her sister, and they called the police. After the police left, A.C. was taken to the hospital for an examination by a SANE nurse. A.C. said they "checked if [she] was okay, but [Cantu] cut [her]." When asked where he cut her, A.C. responded, "[i]n my bottom."

---

[2] To protect the privacy of a minor child, we use initials to refer to the child. TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

[3] The indictment states the assault occurred on or about July 21 and 22, 2018.

On cross-examination, when asked how Cantu "forced" her, she said he kept telling her "sleep in my room[,] sleep in my room." A.C. was asked who told her that she had "some kind of cut," and she replied her nurse told her. A.C. said she went to Letty's house every weekend, but "after that happened, [she] stopped going[,]" and she never asked to go back.

Sandra testified she had primary custody of A.C. and Cantu would see A.C. on the weekends under Letty's supervision. Sandra said that before the assault, A.C. loved her father, and she (Sandra) never said anything bad about him to A.C. Sandra stated that she and A.C. lived in a small house behind her parents' house, and her two sisters lived with her parents. Sandra testified that on July 25, 2018, a few days after the assault, A.C. told her that Cantu "'put his hand inside [her] skirt and – and he poked my anus' – I mean, that wasn't that [sic] word that she used, but she was, like, 'he poked my butt.'" Sandra said A.C. told her that it hurt, and the incident happened in Cantu's room. A few days after the examination at the hospital, Sandra took A.C. to ChildSafe for an interview.

Nancy Silquero, the SANE nurse who conducted the first examination of A.C. in July 2018 in the emergency room, stated A.C. told her Cantu "was putting his finger inside my back and he was hurting me in my privates." Silquero said A.C. "grabbed down in her genital area" when Silquero asked A.C. to identify her "private area." She opined that a child would not know that putting something in her anus would hurt unless something was actually put in her anus and it did hurt. A.C. told her Cantu put his "finger through my private [and] his mouth in the back of my private . . . [h]e went with his tongue." Silquero's report described A.C.'s injuries as redness and irritation to the labia; a superficial tear and abrasion; and redness around the anus. She said the redness was referred to as erythema, which could be due to trauma or something other than trauma.

Annette Santos, a sexual assault nurse, conducted the second examination of A.C. in September 2018. She said A.C. also saw Dr. Nancy Kellogg in August 2018 at which time A.C. still had the redness:

> [A.C.] came in and saw Dr. Kellogg in August. So there was [sic] a couple of areas of question on her bottom, on her anal area, that I think the doctor was trying to determine was it injury caused by trauma or was it something that – a perineal defect, which is just the way her body, like, didn't fuse correctly at that time. And we do see that occasionally. But it's a little hard to tell the difference at first. So we bring them back later to see if it's healed, then it was injury at the time that that happened.
>
> . . .
>
> If it stays the same, then it's just the way her body is.

Santos explained the redness or erythema could be caused by not wiping properly (similar to a baby's diaper rash) or the result of penetration to the anus. She said other "probable defects" were not related to abuse, but the redness that was present when Dr. Kellogg saw A.C. two to three weeks after the SANE nurse's examination was "probably not related to the injury." However, Santos said a child could still feel pain from anal penetration. In her report, she stated "[f]indings to anus are probable defects, not due to the incident happening eight and a half weeks prior." She said the erythema could be due to an injury, poor hygiene, or something else.

San Antonio Police Sergeant Caesar Rodriguez testified that when the case was turned over to him, he took statements from A.C., Sandra, and Letty. He said no DNA was found during the SANE examination. On September 26, 2018, he submitted the case to the district attorney's office. When asked why he submitted the case, Rodriguez responded as follows:

> Even though the SANE came back with no DNA whenever they did examine the victim, they did find some lacerations. And plus, the age of the victim, I believe she was five at the time. It's just the totality of everything, it made me believe she was being honest about what had occurred.

Cantu's brother testified he observed the interaction between A.C. and her father in the years before the assault and described it as a "great relationship" and A.C. "was always asking for

her father, always looking for him." He said he never saw Cantu punish or injure A.C. No other questions were asked.

Letty testified Cantu was always in his daughter's life although she conceded there were "long periods of time" when he was absent from the home. She testified none of her grandchildren slept on the sofa. When asked if A.C. had a habit of sleeping on the sofa in the living room, she responded, "Never." She stated A.C. slept with her in her bedroom, but she also admitted A.C. occasionally slept with Cantu. She said only A.C. was at her house the weekend of the assault, A.C. did not sleep on the sofa that weekend, and A.C. slept with Cantu. Letty stated that the morning after the assault, A.C. was "happy watching TV" and she had no reason to believe anything had gone wrong the evening before. When asked if she had asked A.C. about that evening and whether A.C. had enjoyed herself, Letty responded "yes" and that A.C.'s answer seemed normal. She said A.C. was sad because she had to leave her father to go back to her mother's house and she was crying. On cross-examination, Letty was asked about the statement she gave to Rodriguez. She agreed that, in her statement, she said she had a good relationship with both A.C. and Sandra and Sandra "was happy to accommodate [Letty's] wish to be with [A.C.]."

Cantu testified he saw A.C. on Saturday, July 21, 2018 "after not having seen her for a long time." He said he asked A.C. if she wanted to sleep with him that night or with Letty, and A.C. said she wanted to sleep with her father. He stated he gave her a kiss before he went to sleep and "laid right in next to her." The next morning, when it was time for A.C. to return to her mother's house, A.C. hugged him and said, "'No, daddy,' like, 'I want to stay with you. I don't want to go home." He described A.C. as a happy child and they loved each other. He said he always treated A.C. well.

Cantu said he met Sandra in 2010, they lived together after A.C. was born, and they separated in 2013 when A.C. was almost three years old. He said he and Sandra maintained

"cordial relations" for the most part, but Sandra "wasn't really too happy with [him] coming around." After that, Letty became the "go-between" between A.C. and himself, and he said Sandra loved Letty. He was surprised by the charges against him.

On cross-examination, Cantu admitted he had been incarcerated for about seven months on other charges and he was released on July 14, 2018. The first assault occurred July 21, 2018. He said there was no "bad blood" between his family and Sandra, but he and Sandra had their differences and, if there was "bad blood," it was between him and Sandra. He said he did not remember telling the police officer who arrested him at his parents' home that he had HIV, for which he was diagnosed in January 2018. Cantu testified he was not calling A.C. a liar, but he believed she was not "being accurate with what she's saying so far as it pertain[ed] to him."

After the guilty verdict and sentencing, Cantu filed a motion for new trial and a supplemental motion for new trial in which he alleged numerous grounds including ineffective assistance of counsel and that the State relied on false testimony to convict him. After the hearing on the motion for new trial, the trial court denied the motion and this appeal ensued. On appeal, Cantu raises eight issues. With the exception of a challenge to the legal sufficiency of the evidence in support of two of the four counts, all of Cantu's other complaints were raised in his motion for new trial. In his motion for new trial, Cantu asserted (1) trial counsel rendered ineffective assistance of counsel, (2) his due process rights were violated because the State relied on false testimony to convict him, and (3) prosecutorial misconduct.[4]

## MOTION FOR NEW TRIAL

We review a trial court's ruling on a motion for new trial using an abuse-of-discretion standard of review. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007); *Zarate v. State*,

---

[4] Cantu also asserted in his motion for new trial that he was entitled to a new trial in the interest of justice; however, he does not brief this argument on appeal.

551 S.W.3d 261, 272 (Tex. App.—San Antonio 2018, pet. ref'd) ("When, as here, a defendant raises the issue of ineffective assistance in a motion for new trial, an appellate court reviews the trial court's denial of the motion for abuse of discretion."). We view the evidence in the light most favorable to the trial court's ruling and we will uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Webb*, 232 S.W.3d at 112. "An abuse of discretion occurs only if the trial court's determination lies outside the zone of reasonable disagreement." *Barnett v. State*, 513 S.W.3d 596, 599 (Tex. App.—Houston [14th Dist.] 2016, no pet.). We will not substitute our judgment for that of the trial court; instead, we decide whether the trial court's decision was arbitrary or unreasonable. *Webb*, 232 S.W.3d at 112. Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Id.*

In this case, the trial court's order denying the motion contained findings. We review the trial court's findings of fact and application of law to fact questions that turn on credibility and demeanor for an abuse of discretion. *Barnett*, 513 S.W.3d at 599.

## A.    Ineffective Assistance of Counsel

A defendant is entitled to effective assistance of counsel under the United States Constitution and the Texas Constitution. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. To establish ineffective assistance of counsel, the appellant must show: (1) trial counsel's assistance fell below an objective professional standard of reasonableness and (2) counsel's actions prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999); *Vega v. State*, 610 S.W.3d 79, 82 (Tex. App.—San Antonio 2020, no pet.). Unless the appellant makes both showings, it cannot be said that the conviction "resulted from a breakdown in the adversary process that renders the result unreliable."

*Strickland*, 466 U.S. at 687.  An appellant "bears the burden of proving by a preponderance of the evidence that counsel was ineffective." *Thompson*, 9 S.W.3d at 813.

"To establish deficient performance, an appellant must show counsel's assistance 'fell below an objective standard of reasonableness.'" *Vega*, 610 S.W.3d at 82 (quoting *Thompson*, 9 S.W.3d at 812).  "An appellant must overcome the 'strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.'" *Id.*  In other words, the appellant must overcome the presumption that, under the circumstances, the challenged action or inaction might be considered sound trial strategy.  *Id.*

"To defeat the presumption of reasonable professional assistance, 'any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness.'" *Thompson*, 9 S.W.3d at 814 (citation omitted).  Before granting relief on a claim that defense counsel failed to do something, we ordinarily require that counsel be afforded the opportunity to explain the reasons for his trial court decisions.  *See Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003).  "If no reasonable trial strategy can justify counsel's choices or conduct, performance necessarily falls below an objective standard of reasonableness." *Vega*, 610 S.W.3d at 82.  We "will not second-guess through hindsight the strategy of counsel at trial nor will the fact that another attorney might have pursued a different course of action support a finding of ineffectiveness." *Hawkins v. State*, 660 S.W.2d 65, 75 (Tex. Crim. App. 1983).

"Once an appellant establishes deficient performance, the appellant must then establish prejudice." *Id.* at 83.  An appellant "must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Thompson*, 9 S.W.3d at 812.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

In this case, the trial court conducted a hearing on Cantu's motion for new trial at which several witness, including trial counsel, testified. In his motion, Cantu contended his trial counsel, Eduardo Jimenez, rendered ineffective assistance because counsel failed to: (1) visit the alleged "crime scene" or present evidence of the scene that supported the defense; (2) prepare the witnesses who testified (Letty and his brother); (3) interview and subpoena important witnesses and present favorable witnesses (Cantu's sister, father, and nephew); (4) adequately meet with Cantu to prepare for trial; (5) retain expert witnesses or private investigators; (6) object when the prosecutor committed misconduct; (7) admit or properly present relevant evidence that supported the defense; (8) file motions in limine or object to questions about why Cantu had been absent from A.C.'s life and about Cantu's HIV status; and (9) object when Sergeant Rodriguez improperly bolstered A.C.'s credibility.[5]

**1. Failure to visit the alleged "crime scene" or present evidence of the scene that supported the defense**

At trial, Jimenez asked A.C. about the distance from Letty's bedroom to Cantu's bedroom:

A. It's not that far. I just had to take one or two steps to go in there.
Q. Just one or two steps. Okay. Does [Cantu] have a TV in his room; do you remember that?
A. I think so.
Q. So if – if the TV was on in [Cantu's] room, do you think that Letty's close enough to – to be able to hear that?
[speculation objection sustained]
Q. Okay. But the rooms are . . . quite close; is that what you said?
A. Yes.
Q. And you only had to take a couple steps to be from one room to the next room. Right?
A. Yes.
Q. Okay. Was the door closed or opened?
A. It was closed.

---

[5] In his motion and at the hearing, Cantu relied on various exhibits including affidavits that were admitted into evidence.

In his motion for new trial, Cantu contended these questions indicated Jimenez knew that the layout of Letty's house was important but he failed to visit the house for the purpose of showing how small the house was and how easy it would be for the people in the house to hear what was happening in other rooms. According to Cantu, because Jimenez did not visit the house or present information about its layout or acoustics, A.C.'s testimony that she was kept awake all night while Cantu hurt her went unchallenged.

At the hearing on Cantu's motion for new trial, Jimenez admitted he did not go to Letty's house, but it had been described to him in "great detail" by Cantu, Letty, and Cantu's brother. Jimenez explained he did not visit the house because he would not have been able to testify at trial as a fact witness about the house or its acoustics. Jimenez recalled his one question about the acoustics raised a speculation objection that was sustained.

Even if we assume without deciding that Jimenez should have presented evidence to the jury about the interior of Letty's house and its acoustics, we conclude Cantu has not shown he was prejudiced because there was no testimony that either A.C. or Cantu made any noise during the assault. Therefore, Cantu has not shown a reasonable probability that, but for Jimenez's alleged unprofessional error, the result of the trial would have been different. Accordingly, the trial court did not abuse its discretion in refusing to grant Cantu's motion for new trial on this basis.

**2. Failure to prepare Cantu, Letty, and Cantu's brother before their testimony at trial**

In his motion for new trial, Cantu asserted Jimenez did not prepare his mother, brother, or himself prior to them testifying at trial. Cantu contended his mother should have been allowed to review her prior statement to law enforcement to prepare her to testify, she was nervous and timid on the witness stand, and she was not asked about the weekend of the assault (to establish A.C. never mentioned any pain or discomfort) or about the animosity between himself and Sandra (to establish a motivation to lie). Cantu contended his brother would have testified A.C. was fearful

of her mother, she always asked about her father, and she visited the Cantu home after the assault. Cantu's complaint about Jimenez's failure to prepare his mother and brother centers on his argument that A.C. and Sandra lied when they testified that A.C. stopped going to the Cantu home after the assault. In his motion for new trial, Cantu contended these witness would have established A.C. continued to visit the Cantu home for nearly two years after the assault.

### (a) Preparing Letty

At the hearing, Letty testified she was still seeing A.C. in 2021 and screenshots of text messages dated in April and May of 2021 between A.C. and Letty were admitted for the purpose of showing the two communicated after the assault. No other questions were asked of Letty. In Letty's affidavit, she stated her memory was better in September 2018 when she gave her statement to the police than it was during the 2021 trial. In her affidavit, she stated, among other things, that A.C. continued to come to her house after the assault; A.C. always asked about her father after his incarceration; A.C. did not want to go home to her mother; Sandra told her she wanted to take Cantu's parental rights away; A.C. never once complained about pain or discomfort when she gave A.C. a bath the day after the assault; A.C. hugged her father the morning after the assault and she was not scared, timid, or afraid; and her house is small and she can hear people moving around on Cantu's bed when she is in her room or in the living room. She said Jimenez never discussed the case with her or what information he needed.

Jimenez testified he spoke with Letty "at length" about the relationship between her, A.C., Sandra, and Cantu. Jimenez said he and Letty "conversed about the case many times at great length and in minute detail"; therefore, Letty knew his concerns about the case. He explained,

> [Letty] was informed about what the issues were in the case, what her son was accused of, even the – the medical records and the – even the fact that they had some – some medical evidence that could indicate one – it could indicate that there was penetration and it could indicate that there wasn't penetration.

We went over the evidence together, which [Cantu] authorized me to do that [sic] with his mother. So all that was taken care of.

### (b) Preparing Cantu's brother

Cantu's brother did not testify at the new trial hearing and Jimenez was not asked about why he did not prepare him for his testimony. In the brother's affidavit, he stated he was not prepared to testify because Jimenez did not discuss his testimony with him before trial, A.C. was fearful of her mother, A.C. was always happy when she was with the Cantu family, he never saw Cantu act inappropriately around children, the walls of his parents' home are "paper thin," and he thought the jury should have been shown the house's layout.

### (c) Preparing Cantu

In his motion for new trial, Cantu claimed that when he took the witness stand he had no idea what questions his own attorney would ask him and counsel elicited "prejudicial testimony" from him that he had been confined in jail since his arrest. He also asserted Jimenez met with him at the jail three or four times before trial and each meeting was about fifteen minutes long; they never discussed strategy or discussed details about the case that would assist in his defense, and Jimenez did not review all the discovery with him.

Cantu did not testify at the new trial hearing; however, his affidavit was admitted into evidence. In his affidavit, Cantu stated he thought he met with Jimenez three or four times before trial and they spoke for only fifteen to thirty minutes. He said Jimenez never spoke to him about the "upside and downside" of testifying and, when he took the stand, he did not know what questions Jimenez would ask him. If he had been prepared, he would not have told the jury he was in jail. In his affidavit, Cantu raised a variety of other complaints including that Jimenez had no notes in front of him at trial, he did not prepare Letty for her testimony, he (Cantu) did not know about A.C.'s later follow-up examination until after trial, A.C. spent time with his family after the

assault, his father and sister were important witnesses who should have testified, Jimenez did not hire a private investigator or expert, Sandra hated him and this was never brought up at trial, and his HIV status should not have been mentioned at trial.

At the hearing, Jimenez stated:

> [His] first instincts were to question [Cantu] about [Sandra] from whom he was separated or divorced because it occurred to us that she could have planted this information in [A.C.'s] head as an attempt to get revenge against [Cantu] for past mistakes or simply get him out of her daughter's life altogether. But neither [Cantu] nor his mother (who shared effective custody of [A.C.] with [Sandra]) could substantiate such an argument.

Jimenez recalled Cantu telling him that A.C. loved him, but he did not recall Cantu telling him that Sandra resented A.C. loving her father. Jimenez admitted that "at some point" he "would have read" Cantu's hand-written "Defense Strategy" in which Cantu stated, in part, that Sandra always hated the fact that A.C. loved him, Sandra would tell him she would find a way to take away his parental rights, and A.C. was "terrified" of Sandra. He conceded he did not ask Cantu about Sandra's alleged threats and he acknowledged the contradiction between Cantu and his mother stating they had cordial relations with Sandra and the statements made by Cantu in his "Defense Strategy" letter: "it was a disappointment to me to hear both [Cantu] and his mother testify – and to the best of my recollection, they did testify that they both had quote, unquote cordial relations with the mother of the child." Jimenez also stated, "So – And that [Cantu] essentially had no positive or relationship with the mother of the child. But when he got up on the stand, he testified that he had cordial relations with her and that shocked me. And I wasn't expecting that."

Jimenez also testified he told Cantu that if he took the stand, he would open the door to questions about his criminal past and they discussed the issue "at length" prior to trial. As for Cantu not having seen A.C. for a period of time, Jimenez recalled Cantu's testimony being "more

to the effect, that this was the first time he had seen his daughter in a long time [and] reading between the lines, he was incarcerated."

### (d) Conclusion

The trial court heard conflicting testimony from Letty and Jimenez regarding her preparation for trial and it is clear from this record the trial court impliedly believed Jimenez's testimony that he spoke to Letty at length about the case. This is a credibility determination to which we defer. Regarding the layout and acoustics of Letty's house, there was no testimony that either Cantu or A.C. made any sounds during the assault. In its order denying the motion for new trial, the court found as follows:

> [B]ased on the totality of the evidence, this court does not find that any additional testimony or argument regarding the layout of the house would have changed the outcome of the trial. The child did not testify to screaming or even shouting out loud in response to the alleged sexual assault, so the proximity of the rooms did not seem to be a strong defensive issue.

Regarding animosity with Sandra and a motivation for her or A.C. to lie, Letty and Cantu both testified at trial about a cordial relationship with Sandra. In its order denying the motion for new trial, the court stated:

> There was little to no evidence presented of any motive for the child to fabricate the allegations of sexual assault. However, in closing, the defense counsel noted inconsistencies in the child's testimony and whether the child's story was "totally accurate or not so accurate." When questioned about his lack of fabrication evidence at the motion for new trial hearing, defense counsel said that, although he had intended to discredit the mother and present the possibility that she could have planted this information in her daughter's head, he concluded that the Defendant and his mother both testified that they had a "cordial" relationship with the child's mother. The trial record reflects that the Defendant testified that he tried to maintain a cordial relationship with the complainant's mother, but that he felt that she "wasn't really too happy" with him coming around. Defendant testified to "bad blood" between him and the child's mother, but then admitted that the mother did not actively prevent the child from seeing him. Defense counsel gave the Defendant the opportunity to testify to the things the Defendant stated in his "Defense Strategy" letter (Exhibit 5); however, the Defendant did not reiterate on the witness stand his theory of fabrication prompted by the child's mother. Defense counsel even stated that he was "shocked" and "wasn't expecting that" testimony from the

Defendant. When asked about the child's accusation, the Defendant simply denied doing "anything to her, particularly something like this," and he said it was "shocking" that she was saying that about him. The Defendant denied calling the child "a liar," but at the same time he denied committing the alleged sexual assault.

Regarding Cantu's contention that Jimenez should have done more to prepare the defense witnesses before they testified at trial, the trial court found that

> [t]he trial record reflects that the defense presented witnesses who testified that the Defendant had a good relationship with his daughter. The defense presented testimony that the child complainant was acting normally ("happy") the morning after the alleged assault and did not want to leave her father that Sunday after. More evidence of the child's relationship with her father might have helped, but there was already evidence of that before the jury.

Cantu also complained Jimenez did not prepare him for the "upside and downside" of testifying. We first note that Cantu never stated he wished he had not testified. The right to testify is personal to a criminal defendant. *Johnson v. State*, 169 S.W.3d 223, 232 (Tex. Crim. App. 2005). The defendant possesses the ultimate authority to decide whether to invoke the right. *Id.* at 236. In this case, Cantu chose to invoke his right to testify at trial. The fact that he is disappointed in the outcome of the trial, does not result in ineffective assistance of counsel at trial.

On this record, we conclude Cantu did not establish that Jimenez's performance fell below an objective standard of reasonableness because he did not provide Cantu, Letty, or Cantu's brother additional preparation to testify. Therefore, the trial court did not abuse its discretion in refusing to grant Cantu's motion for new trial on this basis.

### 3. Failure to interview and subpoena important witnesses and present favorable witnesses, and failure to admit or properly present relevant evidence that supported the defense

In his motion for new trial, Cantu alleged Jimenez failed to interview or subpoena important witnesses or present favorable witnesses, specifically, his sister, father, and nephew. Cantu contended:

. . . [the] assertions made by the state's key witnesses [A.C. and Sandra] were verifiably false and had Jimenez interviewed the witnesses, it could have been established to the jury that A.C. and her mom were being untruthful and exposing their credibility on such a simple issue. . . . Instead, this testimony went unchallenged at trial and the false impression was left with the jury that after A.C. made these allegations, she never went near the Cantu family again.

. . .

Contrary to the picture painted by the state at trial, the reality was A.C. continued going over to the Cantu home for nearly 2 years after she made these allegations until the pandemic in 2020. Then, when the pandemic hit, [Letty] continued going to see A.C. at her home and take her food.

Cantu contended his sister would have testified A.C. was always excited to be around him and she would have presented photographs that proved A.C. visited the Cantu family after the assault. According to Cantu, his father and nephew also would have testified about A.C.'s visits with the family after the assault. Cantu contended there was photographic and text message evidence that A.C. visited with the Cantu family after the assault and a 2019 Christmas card and letter showed A.C. loved and missed her father.

### (a) Cantu's sister ("Cindia")

At the hearing, Cindia testified about photographs taken at Letty's house in 2019 and 2020 that included A.C. No other questions were asked. In her affidavit, Cindia stated Jimenez never contacted her before trial and, if he had, she would have explained to him that a subpoena was necessary to allow her to take time off from work to testify. She said she never saw anything that made her suspect Cantu abused A.C. She said A.C. visited the Cantu home after the assault and always asked about her father.

Jimenez testified Cindia would have been a good witness to call at trial because she was a school teacher who worked with small children. Jimenez said he asked Cantu if he wanted to subpoena Cindia and Cantu assured him she would testify. Cindia did not testify during the guilt-

innocence phase of trial because she could not obtain permission from her principal to be absent from school. Jimenez said her inability to testify happened "at the last minute."

### (b) Cantu's father ("Manuel")

Manuel testified at the hearing that he saw A.C. in 2019 and 2020 at his home, his wife brought A.C. from her mother's house to their house, and A.C. visited on the weekends. In his affidavit, Manuel said Jimenez never asked him anything about the case. Manuel stated he was at the house the weekend of the assault and A.C. "was completely her normal self" the morning after the assault; she did not appear sleepy "like she had been up all night"; and A.C. hugged her father when Cantu woke up. Manuel believed the jury would have had a better understanding if they had seen the layout of the house because the rooms are very close and it would be difficult for anyone to do anything without someone knowing. He said he told Jimenez that Sandra threatened to "get [Cantu] locked up," but Jimenez did not appear to care.

Jimenez said he met Manuel when he came to the office to make a payment, but they never talked about the case. Jimenez did not recall Manuel telling him Sandra threatened to "put [Cantu] in jail and take away his rights." He said he did not get information from Manuel whom he remembered as "a very quiet man."

### (c) Cantu's nephew

Cantu's nephew did not testify at the hearing and Jimenez was not asked about the nephew. In the nephew's affidavit, he stated his grandparents' house is small and everything can be overheard, he saw A.C. after the assault, and A.C. missed her father.

### (d) Evidence A.C. visited the family

At trial, Jimenez presented evidence of the card, envelope, and letter but he did not move to admit the contents of the items. At the new trial hearing, Jimenez testified he brought a Christmas card and letter from A.C. to her father to A.C.'s attention at trial and she admitted she

had corresponded with her father after the assault. He thought it might have been helpful for the jury to know the contents of the correspondence, but he stated the card, envelope, and letter were only to refresh her memory about whether she corresponded with her father.

### (e) Conclusion

Counsel's failure to call witnesses at the guilt–innocence or punishment phases of trial is irrelevant absent a showing that the purported witnesses were available and that their testimony would have benefitted the appellant. *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983). Here, Cantu's father and nephew stated they would have testified. Cindia said she needed a subpoena to allow her to leave work in order to testify and Jimenez did not subpoena her for trial. The testimony of these witnesses and the correspondence between A.C. and Cantu centered on the layout of Letty's house, disputing A.C.'s contention that she did not return to Letty's house after the assault, and establishing A.C.'s love for her father. However, as stated above, the trial court found that no additional "testimony or argument regarding the layout of the house would have changed the outcome of the trial" because A.C. "did not testify to screaming or even shouting out loud in response to the alleged sexual assault, so the proximity of the rooms did not seem to be a strong defensive issue." Also as stated above, the trial court found that the defense presented witnesses who testified that Cantu had a good relationship with A.C. who was "acting normally ('happy') the morning after the alleged assault and did not want to leave her father that Sunday after." The court concluded more evidence of A.C.'s relationship with Cantu "might have helped, but there was already evidence of that before the jury."

Furthermore, even if Cantu's father, sister, and nephew were available and willing to testify, they were not eyewitnesses, and their testimony would have done little other than to perhaps diminish A.C.'s credibility about whether and when she visited the Cantu home. Pursuit of that line of attack would have done nothing to refute A.C.'s testimony that her father assaulted

her. *See Hale v. State*, 140 S.W.3d 381, 392-93 (Tex. App.—Fort Worth 2004, pet. ref'd) (trial counsel not found deficient for failing to call certain witnesses because none of appellant's potential witnesses had any personal information concerning the victims' accusations; none of the proposed witnesses could provide an alibi or an eyewitness account of what occurred between appellant and the victims; and "[a]t best, some of the witnesses could offer testimony on their personal observations of appellant interacting with the victims on other occasions and statements to the effect that nothing inappropriate occurred while the witnesses were present").

On this record, we conclude Cantu did not establish that Jimenez's performance fell below an objective standard of reasonableness because he did not interview or subpoena Cantu's father, sister, or nephew or because he did not attempt to admit into evidence other proof of the relationship between A.C. and her father. Therefore, the trial court did not abuse its discretion in refusing to grant Cantu's motion for new trial on this basis.

### 4. Failure to retain expert witnesses or private investigators

In his motion for new trial, Cantu first complained Jimenez did not present evidence that would have challenged the physical evidence of abuse, specifically, the alleged redness and lacerations. Cantu contended Jimenez should have asked questions about whether the physical evidence supported the alleged abuse so as to inform the jury of the actual facts of this case and not allow the prosecutor to infer during testimony and then argue in closing that the redness established abuse. Cantu also contended Jimenez should have hired an expert to assist with asking the appropriate questions and it would have been helpful to present a defense expert to better explain to the jury the medical reports in this case. Second, Cantu contended Jimenez should have consulted with an expert to review A.C.'s statement to assist in formulating questions to ask the State's witnesses. Finally, Cantu contended Jimenez should have retained a private investigator to assist the investigation into A.C.'s allegations. On appeal, Cantu asserts experts and

investigators should have been retained to attack the forensic evidence regarding the redness on A.C.'s anus and to help formulate questions about the circumstances and details of A.C.'s allegations.

Jimenez admitted he did not consult with or retain an expert to help him review the medical records because the records "were clear in terms of their findings." Jimenez said he informed Cantu of his right to retain experts; however, "it was not an issue for [Cantu]." Jimenez also said Cantu did not have the funds to retain an expert or hire an investigator although he admitted he had retained experts for other indigent clients. In its order, the trial court found as follows:

> Appellate counsel criticized defense counsel for not enlisting the services of a medical expert. The trial record reflects that defense counsel cross-examined the SANE nurse regarding the redness or irritation around the complainant's anus. This court finds that defense counsel solicited sufficient evidence from the State's witness to support the argument that he made in closing that the irritation around the child's anus was more likely than not the result of something other than the alleged sexual assault by the Defendant – congenital defect, bad hygiene, constipation, or diarrhea. Under these facts, it does not appear to this court that the failure of the defense attorney to obtain the services of a medical expert amounted to ineffective assistance of counsel.

Even if we conclude Jimenez's performance was deficient because he should have retained experts and/or investigators, we cannot on this record conclude Cantu was prejudiced. The jury heard testimony from Silquero, the SANE nurse who conducted the first examination of A.C. in July 2018, that the redness around A.C's anus could have been caused by trauma or something other than trauma. The jury also heard testimony from Annette Santos, the sexual assault nurse who conducted the second examination of A.C. in September 2018, that the redness or erythema could be caused by not wiping properly (similar to a baby's diaper rash) or the result of penetration to the anus. Santos said other "probable defects" were not related to abuse, but the redness that was present when Dr. Kellogg saw A.C. two to three weeks after the SANE nurse's initial examination was "probably not related to the injury." However, Santos also said a child could still

feel pain from anal penetration. In her report, Santos stated "[f]indings to anus are probable defects, not due to the incident happening eight and a half weeks prior." She said the erythema could be due to an injury, poor hygiene, or something else. Thus, the jury heard testimony from two State witnesses that the redness may not have been the result of a sexual assault. During his closing argument, Jimenez told the jury the only evidence they should focus on was the testimony from Santos that the redness was not caused by trauma.

We conclude, Cantu has not shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Vega*, 610 S.W.3d at 83. Accordingly, the trial court did not abuse its discretion in refusing to grant Cantu's motion for new trial on this basis.

**5. Failure to object when the prosecutor committed misconduct**

In his motion for new trial, Cantu asserted Jimenez failed to object when the prosecutor committed misconduct by (1) asking Cantu about his physical health (HIV status), (2) eliciting testimony about A.C. being "cut," (3) and eliciting testimony about and arguing during closing that the redness around A.C.'s anus was evidence of alleged abuse.

**(a) Cantu's health status**

During cross-examination of Cantu, the following testimony was elicited by the State:

Q. And when you were arrested, the officer asked if you had any medical – medical conditions. Do you remember that?
A. It was a while back. I don't really recall, but I'm not sure what my answer was.
Q. Do you remember telling him that you had HIV?
A. I don't believe I told the officer that.
Q. Do you have HIV?
A. Yes, I do.
Q. Okay. When were you diagnosed with HIV?
A. In 2018.
Q. And when about – Was that before or after this incident?
A. Way before this incident, in January of 2018.
Q. Okay. So was that around the time you went into custody?
A. I believe so.

Cantu's health status was not mentioned again, either in questioning or closing arguments. At the new trial hearing, Jimenez said he did not recall the State's questions or whether he objected, but he conceded it was "a highly prejudicial questioning" in a case such as this one. Although Jimenez conceded questions about Cantu's health status were prejudicial, this admission should not be interpreted as a reflection of whether he had a strategy at trial. The record does not reflect why Jimenez did not object, and there is at least a possibility that not objecting was legitimate trial strategy. The testimony was not emphasized by the State when it was introduced, and an objection could have potentially drawn the jury's attention to this testimony. *Huerta v. State*, 359 S.W.3d 887, 894 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("Counsel may have also decided to withhold objections to avoid drawing unwanted attention to a particular issue, or to prevent the impression that she was objecting at every opportunity as a means of stonewalling evidence."). Also, the complained-of testimony constituted a very small part of the evidence. "Isolated failures to object to improper evidence do not constitute ineffective assistance of counsel." *Wenzy v. State*, 855 S.W.2d 52, 53 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd) ("The right to effective assistance of counsel does not mean errorless counsel whose competency or accuracy of representation is to be judged by hindsight.").

We conclude that because the record is silent regarding the reason Jimenez did not object, we will not speculate as to his reasons but must presume his decision not to object was part of his strategy. Thus, on this record, we conclude Cantu has not established that Jimenez's representation fell below an objective standard of reasonableness because he did not object to questions about Cantu's health status. Therefore, the trial court did not abuse its discretion by refusing to grant his motion for new trial on this basis.

**(2) The "cut"**

On direct examination by the State, A.C. said the hospital "checked if [she] was okay, but [Cantu] cut [her]." When asked where he cut her, A.C. responded, "In my bottom." No other questions about the cut were asked by the State. On cross-examination, Jimenez asked A.C. who told her that she had "some kind of cut," and A.C. replied her nurse told her. Jimenez later asked A.C. about the cut again:

> Q. Okay. And when you say you had a cut, you had told the jury and you told me earlier that – that he hurt you. Like, did it physically hurt your body, or, like, it was painful, or something different?
> A. It was painful.
> Q. Okay. So when they – they told you that there was a cut, had – had you already experienced pain or did it hurt before that or did it hurt after they gave you the exam?
> A. Well, it hurt before they even did the exam and they – before they even told me I had a cut.
> Q. Okay. Okay. Did you tell people that it hurt physically, like, it was painful?
> A. I only told my mom.
> Q. Okay. So, I mean, you had told your mom because she's the one that you told before that, that he – that he put his finger in your butt. Right?
> A. Yes.
> Q. Okay. And you told her that it caused you pain?
> A. Yes.

During the new trial hearing, Jimenez was asked about his questioning of A.C.:

> Q. Okay. But at the time of trial, you were aware that the anal findings, like, what were suspected lacerations at the initial SANE exam, they were eventually proven to be perineal defects. Correct?
> A. Yes.
> Q. That means [A.C.] was born – most likely born with these defects?
> A. Yes, we talked at great length about that at trial.
> Q. Okay. So when [A.C.] was testifying, you knew that these were perineal defects. Do you recall asking her about getting cut during the alleged abuse?
> A. Yeah, she told me she felt like she got cut.
> Q. Okay.
> A. And she expressed that it hurt. So I don't – Her [sic] and I never talked – If you're wondering if her [sic] and I ever talked about the fact that there were these defects, we did not. But she told me that he cut her, and so I – I asked her to clarify and I believe that she said that it hurt.
> Q. Yeah. You did ask follow-up questions on redirect about did the cuts cause her pain. Do you remember that?

A. Yeah.

Q. But at the time you asked that question, you knew that there were no cuts. Correct?

A. I didn't know that. I mean, I – I knew that – I was asking the child how she felt. I knew that the – the defects that originally looked like cuts were – were congenital and not as a result of trauma.

I don't – I just – I was asking the child questions, and I wasn't correcting what came out of her mouth.

Q. But you followed up and elicited more testimony about cuts that you knew were proven to be perineal defects?

A. I asked her about her statement to me, yes.

Q. Okay. And the child only said that she was cut because she said the original nurse told her that she had been cut. Correct? Do you recall that?

A. I don't. I would have to refer – I mean, the record would reflect, I guess, if that's what she said.

It is clear from the record of the trial that Jimenez asked A.C. about the alleged cut for the purpose of clarifying why A.C. said she was cut—because a nurse told her—and to clarify that A.C. felt pain. On this record, we conclude Cantu did not establish that Jimenez's performance fell below an objective standard of reasonableness because he elicited testimony about the cut. Therefore, the trial court did not abuse its discretion by refusing to grant his motion for new trial on this basis.

### (3) The "redness"

In his motion for new trial, Cantu complained the State elicited testimony about the redness and argued during closing that the redness was evidence of alleged abuse. On appeal, he complains only about closing arguments and, in a single sentence, merely states Jimenez did not object. More specifically, Cantu contends the State's argument that there was evidence of abuse was not "a logical summation of the evidence." We do not decide whether the State's closing amounted to prosecutorial misconduct because—as Cantu correctly noted in his motion for new trial—the proper method to preserve error from prosecutorial misconduct is to (1) make a timely and specific objection, (2) request an instruction that the jury disregard the prosecutor's comment or question, and (3) move for a mistrial. *See Penry v. State*, 903 S.W.2d 715, 764 (Tex. Crim. App. 1995).

Because Jimenez did not object, the question of whether the prosecutor's conduct was improper is not before us. Therefore, we consider only whether Jimenez's performance was deficient because he failed to object to the State's closing.

At the new trial hearing, Jimenez was not asked why he did not object to the State's closing argument. Because we will not speculate on whether he had a trial strategy for not doing so, on this record, we conclude Cantu has not established that Jimenez's representation fell below an objective standard of reasonableness because he did not object to the State's closing argument. Therefore, the trial court did not abuse its discretion by refusing to grant his motion for new trial on this basis.

### 6. Failure to file motions in limine or object to testimony about why Cantu had been absent from A.C.'s life and about Cantu's health issues

In his motion for new trial, Cantu asserted Jimenez failed to file any pretrial motions that might have prevented the jury from hearing about his prior criminal record, about the reasons he was absent from A.C.'s life for long periods of time (because he was incarcerated), or about his HIV status. At the new trial hearing, Jimenez was asked whether he filed a motion in limine regarding Cantu's health status and he replied that he did not recall filing such a motion. No other questions were asked about his reasoning for not doing so. Furthermore, Jimenez was not asked about filing a motion in limine regarding Cantu's prior criminal record or the reasons Cantu was absent from A.C.'s life for long periods of time. Cantu's argument on appeal asks us to speculate about Jimenez's trial strategy, something we cannot do.

The failure to file pretrial motions generally does not amount to ineffective assistance of counsel because trial counsel may decide not to file pretrial motions as part of his trial strategy. *Mares v. State*, 52 S.W.3d 886, 891 (Tex. App.—San Antonio 2001, pet. ref'd) (decision not to pursue pretrial motions "is not categorically deemed ineffective assistance of counsel"). Here,

Jimenez was not afforded an opportunity to explain his actions, or inactions; therefore, the record does not contain any evidence of Jimenez's strategy, and we must presume that his performance was effective. *See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (absent the opportunity to explain, appellate courts should find ineffective assistance only if challenged conduct was "so outrageous that no competent attorney would have engaged in it"); *Smith v. State*, 84 S.W.3d 36, 42 (Tex. App.—Texarkana 2002, no pet.) ("Without evidence of the strategy and methods involved concerning counsel's actions at trial, the court will presume sound trial strategy."). Thus, on this record, we conclude Cantu has not established that Jimenez's representation fell below an objective standard of reasonableness because he did not file any pretrial motions in limine. *See Miranda v. State*, 993 S.W.2d 323, 327 (Tex. App.—Austin 1999, no pet.) (defendant did not overcome strong presumption trial counsel's strategy was reasonable where nothing in record revealed strategy with regard to decision not to file pretrial motions). Therefore, the trial court did not abuse its discretion by refusing to grant his motion for new trial on this basis.

### 7. Failure to object when Sergeant Rodriguez improperly bolstered A.C.'s credibility

In his motion for new trial, Cantu contends Rodriguez's statement that "just the totality of everything . . . made me believe [A.C.] was being honest about what had occurred" amounted to an improper comment on A.C.'s credibility. We do not decide whether Rodriguez's testimony amounted to improper bolstering because such a complaint was not preserved for our review. *See* TEX. R. APP. P. 33.1(a)(1). Therefore, the only issue before us is whether Jimenez's performance was deficient because he failed to object.

On appeal, Cantu does not explain why Jimenez's performance in this respect was deficient. Furthermore, at the new trial hearing, Jimenez was not afforded an opportunity to explain his actions, or inactions; therefore, the record does not contain any evidence of Jimenez's

strategy, and we must presume that his performance was effective. *See Goodspeed*, 187 S.W.3d at 392; *Smith*, 84 S.W.3d at 42. Thus, on this record, we conclude Cantu has not established that Jimenez's representation fell below an objective standard of reasonableness because he did not object to Rodriguez's statement. Therefore, the trial court did not abuse its discretion by refusing to grant his motion for new trial on this basis.

### 8. Prejudice

On appeal, Cantu contends his viable defense (which he does not specifically identify) was not presented and the State's case went virtually unchallenged. Cantu relies on the trial court's statements in its order denying the motion for new trial and on the fact that Jimenez presented prejudicial testimony that Cantu was in jail; failed to object when the State elicited false testimony about A.C. being cut; failed to object to the State's prejudicial questions about him having HIV; and was not prepared with favorable medical evidence in this case. In its order, the trial court stated as follows:

> In a "he said/she said" type of case such as this, where both the child complainant and the defendant testify, and their credibility is at the heart of the case, it is difficult to say whether the outcome would have changed had trial counsel done anything differently. The jury's verdict reflects that the jury believed the child, not the defendant. This court cannot re-evaluate the weight and credibility of the evidence or substitute its judgment for that of the jury. *Williams v. State,* 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). The jury is the sole judge of the witness's credibility and the weight given their testimony. Furthermore, "cross-examination is inherently risky, and a decision not to cross-examine a witness is often the result of wisdom acquired by experience in the combat of trial." *Ex parte McFarland*, 163 S.W.3d 743, 756 (Tex. Crim. App. 2005) (orig. proceeding) (citing *Coble v. State*, 501 S.W.2d 344, 346 (Tex. Crim. App. 1973)) ("cross- examination is an art, not a science, and [the decision not to cross-examine a witness] cannot be adequately judged in hindsight."). Appellate counsel did present examples of evidence and argument [at the new trial hearing] that the defense counsel could have and should have presented to the jury.

> It appears that trial counsel's performance was flawed and may have been close to deficient. Nevertheless, although a close call, this court is hesitant to say that harm resulted from that deficiency sufficient to undermine confidence in the

outcome of the trial. Even if Defendant has satisfied the first prong of *Strickland*, this court does not find that the second prong of prejudice has been met here.

On appeal, Cantu takes issue with the trial court's statement that "this court is hesitant to say that harm resulted from that deficiency sufficient to undermine confidence in the outcome of the trial" contending this is not the correct standard. We disagree. As stated above, "[o]nce an appellant establishes deficient performance, the appellant must then establish prejudice." *Vega*, 610 S.W.3d at 83. An appellant "must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* We conclude on this record that the trial court did not abuse its discretion in determining Cantu was not prejudiced by Jimenez's performance.

**B.      State's reliance on allegedly false testimony**

In his motion for new trial, Cantu also asserted the State violated his due process rights by relying on false testimony from A.C. and Sandra. On appeal, Cantu points to two instances of allegedly false testimony. First, he contends both Sandra and A.C. falsely testified that A.C. never went back to Letty's house or spent time with the Cantus after the incident. Second, he contends A.C. lied about a cut on her anus and two other people repeated this false testimony at trial. Cantu contends this was a lie because the cut was a perineal defect, and not the result of abuse.

Cantu raised the complaint about whether A.C. spent time with the Cantu family after the assault only in the context of his ineffective assistance of counsel argument, which we have addressed above. Therefore, we address Cantu's due process argument only in the context of whether the State relied on false testimony that A.C. sustained any cuts as a result of abuse. Cantu contends the prosecutor knew A.C. did not sustain any cuts when she asked A.C. about the cut.

"[T]he State violates a defendant's right to due process when it actively or passively uses perjured testimony to obtain a conviction." *Ex parte Castellano*, 863 S.W.2d 476, 481 (Tex. Crim. App. 1993). "Such a violation occurs whenever the prosecutor has actual or imputed knowledge of the perjury." *Id.* "The State's 'constitutional duty to correct known false evidence is well established both in law and in the professional regulations which govern prosecutorial conduct." *Valdez v. State*, No. AP-77,042, 2018 WL 3046403, at *3 (Tex. Crim. App. June 20, 2018) (not designated for publication) (citation omitted). "It does not matter whether the prosecutor actually knows that the evidence is false; it is enough that he or she should have recognized the misleading nature of the evidence." *Id.* (citation omitted). "Further, it matters not whether the falsity concerns the accused's guilt or the witness's credibility: 'A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth.'" *Id.* (citation omitted). "If the prosecution presents a false picture of the facts by failing to correct its own testimony when it becomes apparent that the testimony was false, then the conviction must be reversed." *Losada v. State*, 721 S.W.2d 305, 311 (Tex. Crim. App. 1986). "However, the appellant bears the burden of showing that the testimony used by the State was in fact perjured." *Id.* Discrepancies in testimony alone do not establish falsity. *See id.* at 312.

"The knowing use of false testimony violates due process only when a 'reasonable likelihood' exists that the false testimony affected the outcome, i.e., the false testimony was material." *Valdez*, 2018 WL 3046403, at *4; *see also Ex Parte Weinstein*, 421 S.W.3d 656, 665 (Tex. Crim. App. 2014) ("The applicant must still prove his habeas-corpus claim by a preponderance of the evidence, but in doing so, he must prove that the false testimony was material and thus it was reasonably likely to influence the judgment of the jury."). "The 'reasonable likelihood' standard is equivalent to the standard for constitutional error, which 'requir[es] the

beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Ex parte Ghahremani*, 332 S.W.3d 470, 478 (Tex. Crim. App. 2011).

In his motion for new trial, Cantu asserted his due process rights were violated by the State's use of false testimony to convict him. At trial, A.C. testified the hospital "checked if [she] was okay, but [Cantu] cut [her]." A.C. also was asked who told her that she had "some kind of cut," and she replied her nurse told her. According to Cantu, the prosecutor knew there were no cuts when she asked A.C. about the cuts and when she raised the issue again with the SANE nurse and Rodriguez. The next day, however, the sexual assault nurse testified the redness was not due to abuse.

We conclude Cantu has not met his burden for two reasons. First, at most the testimony about the "cuts" or "lacerations" amounted to "discrepancies in testimony," which alone do not establish falsity. *See Losada*, 721 S.W.2d at 312. Second, because the jury heard testimony that Cantu hurt A.C., although the condition of her anus may not have been the result of the abuse, we cannot—on this record—conclude a "'reasonable likelihood' exists that the [alleged] false testimony [about whether or how A.C. was cut] affected the outcome, i.e., the false testimony was material." *Valdez*, 2018 WL 3046403, at *4; *see also Weinstein*, 421 S.W.3d at 665. Therefore, the trial court did not abuse its discretion by refusing to grant his motion for new trial on this basis.

**C.** **Prosecutorial Misconduct**[6]

In his motion for new trial, Cantu alleged the prosecutor committed misconduct by asking Cantu about his physical health and by improperly eliciting false testimony and arguing during closing that the redness around A.C.'s anus was evidence of alleged abuse.

Claims of prosecutorial misconduct are determined on a case-by-case basis. *Stahl v. State*, 749 S.W.2d 826, 830 (Tex. Crim. App. 1988). Prosecutorial misconduct has been found where (1) the prosecutor's actions deliberately violated an express court order and (2) the prosecutor's misconduct was so blatant as to border on being stubbornly disobedient. *Id.* at 831. Prosecutorial misconduct may also be shown where the prosecutor asks a question that is "clearly calculated to inflame the minds of the jury and is of such a character so as to suggest the impossibility of withdrawing the impression produced." *See Huffman v. State*, 746 S.W.2d 212, 218 (Tex. Crim. App. 1988) (citation omitted).

### 1. Cantu's health status

At trial, the State elicited testimony, without objection, that Cantu was diagnosed with HIV in 2018. "Generally, any error in asking an improper question is cured or rendered harmless by an instruction to disregard." *Rodriguez v. State*, No. 08-01-00103-CR, 2004 WL 241531, at *4 (Tex. App.—El Paso Feb. 10, 2004, no pet.) (mem. op., not designated for publication) ("Appellate courts rarely reverse a conviction due to an improper prosecutorial question."). "In order for a defendant to preserve a complaint about prosecutorial misconduct, he must make a timely and specific objection in the trial court, request an instruction to disregard the matter improperly placed before the jury, and move for a mistrial; otherwise, his complaint is forfeited." *Bautista v. State*,

---

[6] Cantu also contends on appeal the State committed prosecutorial misconduct by improperly eliciting false testimony. We have already addressed the issue of the State's use of allegedly false testimony in the context of Cantu's due process violation argument.

363 S.W.3d 259, 262-63 (Tex. App.—San Antonio 2012, no pet.); *see also* TEX. R. APP. P. 33.1(a). "The necessity to raise an objection in the trial court applies regardless of whether an instruction to disregard could have cured the improper argument." *Id.* at 263.

On appeal, Cantu acknowledges neither an objection nor request for an instruction was made at trial. Because Cantu did not contemporaneously object to the complained-of testimony to the trial court, he has failed to preserve these issues for our review. *Threadgill v. State*, 146 S.W.3d 654, 670 (Tex. Crim. App. 2004) ("Because appellant failed to object to the jury argument, he has forfeited his right to raise the issue on appeal."); *see also Neal v. State*, 150 S.W.3d 169, 180 (Tex. Crim. App. 2004) ("Because appellant never presented his prosecutorial vindictiveness claim in the trial court, he failed to preserve this issue for appellate review.").

### 2. Closing argument

On appeal, Cantu does not point to the specific statements made by the State in its closing argument that he contends did not amount to evidence summation or a reasonable deduction from the evidence. Instead, he references the prosecutor's testimony from the new trial hearing about the redness to A.C.'s anus.[7]

"The right to a trial untainted by improper jury argument is forfeitable." *Hernandez v. State*, 538 S.W.3d 619, 622 (Tex. Crim. App. 2018). "In order to claim on appeal that an instruction to disregard was inadequate to cure erroneous jury argument, the defendant must object and pursue his objection to an adverse ruling." *Id.* "If he fails to pursue his objection to an adverse

---

[7] Cantu points to the following question and answer by the prosecutor during the new trial hearing:
Q. Okay. And knowing Dr. Kellogg's report two weeks later that the – that the abnormalities and the redness were still there, you argued during closing argument that the fact that the subsequent examination said that the six o'clock and 12 o'clock perineal defects were still there, but the erythema, the redness was not, it was resolved, should tell you something.
But that statement you made to the jury, do you agree with me it's not – is not accurate?
A. No, I wouldn't agree. Because during – during the followup exam, and I supposed it would be the second followup exam, they weren't present. I mean, they can – they can use the circumstances however they want. You and I both know that. So . . ..

ruling, he forfeits his right to complain on appeal about the argument." *Id.* "Even an inflammatory jury argument is forfeited if the defendant does not pursue his objection to an adverse ruling." *Id.* at 622-23 ("But we will not elevate the right to be free of improper jury argument to the status of an absolute requirement like jurisdiction. [citation omitted] Erroneous jury argument must be preserved by objection pursued to an adverse ruling; otherwise, any error from it is waived."); *see also Estrada v. State*, 313 S.W.3d 274, 303 (Tex. Crim. App. 2010) (even assuming prosecutor's argument was so egregious that instruction to disregard would be ineffectual, defendant "should have moved for a mistrial to preserve this error.").

By failing to timely and properly object, Cantu forfeited his complaints about the State's closing arguments. *See Morris v. State*, 460 S.W.3d 190, 197 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (holding, in case in which appellant argued prosecutor's closing argument was "incurable fundamental error," that, "[e]ven if the State's argument [was] incurable and rose to the level that it deprived appellant of his right to due process of law, appellant waived this complaint by failing to object in the trial court"); *Moreno v. State*, 195 S.W.3d 321, 328-29 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (holding that because he did not object in trial court, appellant waived his right to complain on appeal that his due-process rights were violated when prosecutor referred to his status as an illegal immigrant during closing argument in punishment phase and argued that this status warranted more severe punishment than community supervision).

## LEGAL SUFFICIENCY OF THE EVIDENCE

Finally, Cantu asserts the evidence on Count Two (penetration of anus of a child younger than fourteen years of age with mouth on July 21, 2018) and Count Four (penetration of anus of a child younger than fourteen years of age with mouth on July 22, 2018) is legally insufficient.

**A.**  **Standard of Review**

In determining whether the evidence is legally sufficient to support a conviction, the reviewing court must consider "the combined and cumulative force of all admitted evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, a jury was rationally justified in finding guilt beyond a reasonable doubt." *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)); *see Huff v. State*, 467 S.W.3d 11, 19 (Tex. App.—San Antonio 2015, pet. ref'd).  The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt.  *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

In a sufficiency review, direct evidence and circumstantial evidence are equally probative. *Tate*, 500 S.W.3d at 413.  Circumstantial evidence alone may be sufficient to uphold a conviction as long as the cumulative force of such evidence is sufficient to support the conviction.  *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015).

The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses, and we may not substitute our judgment for that of the jury.  *Huff*, 467 S.W.3d at 19-20.  As the sole judge of a witness's credibility and the weight to be given such testimony, the jury may choose to believe all, none, or any part of a witness's testimony, even if such testimony is contradicted.  *See Dossett v. State*, 216 S.W.3d 7, 31 (Tex. App.—San Antonio 2006, pet. ref'd). Moreover, juries are entitled to draw multiple reasonable inferences from the facts as long as the evidence supports each inference.  *Tate*, 500 S.W.3d at 413.  However, a jury may not draw conclusions based on pure speculation.  *Id.*  Speculation, unlike a reasonable inference, is not sufficiently based on the evidence to support a finding beyond a reasonable doubt.  *Id.*  "When the record supports conflicting inferences, we must presume the jury resolved the conflicts in favor of

the verdict." *Id.* This presumption includes inferences from circumstantial evidence. *Huff*, 467 S.W.3d at 19.

**B.       Applicable Law**

The Texas Penal Code provides that a person commits the offense of aggravated sexual assault if the person "regardless of whether the person knows the age of the child at the time of the offense, intentionally or knowingly . . . causes the penetration of the anus or sexual organ of a child by any means [or] causes the anus of a child to contact the mouth, anus, or sexual organ of another person, including the actor [and] the victim is younger than 14 years of age, regardless of whether the person knows the age of the victim at the time of the offense . . .." TEX. PEN. CODE § 22.021(a)(1)(B), (a)(2)(B). "An offense under this section is a felony of the first degree." *Id.* § 22.021(e).

"Although penetration must be proved beyond a reasonable doubt[,] it does not have to be of any particular depth." *Johnson v. State*, 449 S.W.2d 65, 68 (Tex. Crim. App. 1969); *see Casillas v. State*, No. 04-09-00393-CR, 2010 WL 3332165, at *1 (Tex. App.—San Antonio Aug. 25, 2010, pet. ref'd) (mem. op., not designated for publication) (quoting *Johnson*). "Any penetration, no matter how slight, is sufficient to satisfy the requirements" of the aggravated sexual assault statute. *Johnson*, 449 S.W.2d at 68; *Zuniga v. State*, 811 S.W.2d 177, 180 (Tex. App.—San Antonio 1991, no pet.) ("Penetration, however slight, will sustain a sexual assault allegation."). However, "mere contact with the outside of an object does not amount to penetration." *Vernon v. State*, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992).

Physical evidence is not necessary to affirm a sexual assault conviction. *See Bargas v. State*, 252 S.W.3d 876, 888 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (stating physical evidence is not required to affirm a sexual assault conviction when the child victim provides ample testimony to establish that a sexual assault occurred). Instead, the uncorroborated testimony of a

child seventeen years of age or younger is sufficient to support a conviction for aggravated sexual assault of a child. *Bautista v. State*, 619 S.W.3d 374, 378 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (citing TEX. CODE. CRIM. PROC. art. 38.07). Furthermore, outcry testimony retains probative value even if other evidence contradicts the outcry statement. *Bargas*, 252 S.W.3d at 888 (citing *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)). Courts liberally construe the testimony of child sexual abuse victims. *Id.*

## C.   Analysis

Cantu contends the evidence is legally insufficient to support a finding that his mouth penetrated A.C.'s anus. We disagree. A.C. testified Cantu "started hurting [her] for the rest of the night . . .." A.C. testified as follows:

> Q. . . . Did you tell them what happened when you went to the hospital?
> A. Yes.
> Q. Okay. And you said that he put his thumb in your bottom. Did he put his mouth on your bottom?
> A. Yes.
> Q. Okay. When I asked you earlier if he put any other part of his body on you, and you said, "No," was that accurate, or was that not accurate? Was that true or not true?
> A. True.
> Q. Okay. I – I think I'm getting confusing. So earlier, I said: Did he put any other part of his body on you, besides his finger? Okay. Did he put his mouth on you?
> A. Yes.
> Q. Okay. Did you tell that to the people at the hospital?
> A. Yes.
> Q. Okay. And is that a comfortable thing for you to say right now in front of everybody?
> A. No.
> Q. Okay. Do you – Can you tell me what do you mean by he put his mouth on your bottom? What did he do?
> A. He put his tongue in my bottom.
> Q. Okay. Did he put his tongue in your bottom in the same way that he put his finger in your bottom?
> A. No.
> Q. Okay. What did he do with his tongue?
> A. He moved it around.
> Q. Okay. And did that hurt you?
> A. Yes.

Q. Okay. And, [A.C.], was this the only day that he did this, that – that night?
A. He did it for two days.
Q. Okay. Did you feel pain afterward?
A. Yes.
Q. Okay. Did any other part of his body touch your body besides his tongue and besides his finger?
A. No. He only used his tongue and finger.
Q. Okay. Did he touch any other part of your body other than your bottom, your butt?
A. No. Just my bottom.

The SANE nurse testified she asked A.C. about being hurt:

And I asked her, "How was he hurting you?" And she said, "He was going through my private and he was putting his finger inside my back, and he was hurting me in my private. That's why I don't want to tell my mom again." She said that.

And then on the next one, I asked her what – on the next page, I said, "What parts of his body touched your body?"

And she said, "Just his finger through my private. His mouth in the back of my private. He went with his tongue."

We conclude A.C.'s testimony that Cantu put his tongue in her "butt" is legally sufficient evidence of penetration. Also, A.C. testified that Cantu hurt her, from which the jury could have rationally concluded that at least minimal penetration of the anus occurred. *See Martinez v. State*, No. 14-03-00596-CR, 2004 WL 1153682, at *2 (Tex. App.—Houston [14th Dist.] May 25, 2004, pet. ref'd) (mem. op., not designated for publication) ("The jury's determination that appellant penetrated C.B.'s anus [based in part on C.B.'s testimony 'that the anal sex resulted in pain and bleeding'] was neither irrational nor unsupported by proof beyond a reasonable doubt.").

### CONCLUSION

For the reasons stated above, we affirm the trial court's judgment.

Lori I. Valenzuela, Justice

Publish